**STATE of Minnesota, Respondent,**

v.

**Larry Gene RACE, Appellant.**

**No. C7–84–277.**

Supreme Court of Minnesota.

March 21, 1986.

David W. Larson, Minneapolis, Phillip Villaume, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan L. Mitchell, Co. Atty., and John E. DeSanto, Asst. Co. Atty., Duluth, for respondent.

KELLEY, Justice.

Larry Gene Race was convicted and sentenced to life imprisonment for the first-degree murder of his wife, Deborah Race. In this appeal he asserts: (1) that since the state's case was based entirely on circumstantial evidence, the evidence was insufficient to support the jury's verdict of guilt; (2) his trial counsel failed to meet the minimum standards of effectiveness, thereby denying him his constitutional right to effective representation at trial; and (3) he was deprived of a fair trial and due process by alleged erroneous comments of the prosecutor during final argument. We affirm the conviction.

1. Deborah Race, appellant's wife and the mother of his three children, died as the result of immersion hypothermia due to exposure to the 35 to 37° Fahrenheit water of Lake Superior during the night of May 11–12, 1982.

That night was the 14th wedding anniversary of Deborah and appellant. To celebrate the occasion, the two left their home in Hoyt Lakes in the late afternoon of May 11 to go to Lake Superior. The evening plans included dinner at a lakeshore restaurant, the Lakeview Castle, and a boat ride on the lake in a boat owned by appellant.

Following dinner, they drove up the shore of the lake to the Knife River Marina, where appellant had previously left his boat. After loading equipment aboard, the two left the marina in the boat and proceeded onto the lake. Sometime during that outing, Deborah, allegedly fearing the boat was sinking, left it and entered a two-person rubber life raft. Her body was found on the shore of Lake Superior the following afternoon. Eleven months later, a St. Louis County Grand Jury indicted appellant with the crime of first-degree murder. After trial and conviction, he was sentenced to prison for life.

Since 1976, Race had been an avid boater and scuba diver. The subject of hypothermia was covered in a 1976 scuba diving course which he completed. In the ensuing years, appellant Race spent substantial amounts of time and money on the sport, diving as much as 40 times per year, almost always in Lake Superior. During this time, not only did appellant become an ex-

cellent diver, but he also acquired substantial knowledge about immersion hypothermia.

As an adjunct to his diving hobby, in 1978 appellant acquired a 22-foot cabin cruiser named the Jenny Lee. The previous owner claimed the Jenny Lee was structurally sound when sold and that he had never had any problem with the engine. However, after acquisition, appellant did make substantial changes to the boat.

Other expensive equipment was purchased to enable appellant to dive for shipwrecks on the bottom of Lake Superior. Included among that equipment was a dry suit, which is significantly better than a wet suit for diving in the cold Lake Superior waters. For a diver to stay in cold water for extended lengths of time, a dry suit is considered a necessity. According to the trial testimony of Dr. Robert S. Pozos, an expert on hypothermia, a diver in a dry suit could stay in 37° Fahrenheit water almost indefinitely without developing hypothermia.

In late summer 1981, while appellant and two of his children were aboard the Jenny Lee several hundred feet off shore, the boat began to take on water. Appellant then donned his dry suit, put the children into an inflated life raft, and pushed the life raft carrying the children to safety on the shore. On that occasion, the Jenny Lee eventually sank.

After the Jenny Lee had been raised from the lake, appellant Race proceeded to effectuate repairs. Much of the repair work was done by himself, but he did hire a mechanic to overhaul the boat's engine. In the course of the engine overhaul, new gaskets and new steel bolts were installed, but the exhaust manifold was not rebuilt. In installing the rebuilt engine in the boat on May 7, 1982, difficulty was experienced with an exhaust manifold bolt. One of the bolt holes was stripped and had to be rethreaded. On-land testing of the remounted engine revealed no difficulty other than a

very slow drip-type leak that appeared to pose no danger to occupants of the boat. Upon water testing, the boat seemed to run well, and the leak did not worsen.

On May 8, 1982, appellant launched the Jenny Lee on Lake Superior and went diving for shipwrecks with friends. One of the friends testified that no problems were experienced with the boat that day. Prior to this expedition, appellant had talked to two friends about safety equipment in the boat. Neither, however, personally observed the equipment or, in particular, how many life rafts were aboard. A deputy sheriff testified he was stopped by a man resembling appellant and was asked to do a safety inspection of a boat. Although the officer declined to perform the inspection, he did list for the man the safety equipment required by state law. The man said he had two life rafts on board, but the deputy did not verify that claim by inspection.

While appellant was loading the Jenny Lee at the Knife River Marina about 7:30 p.m. on May 11, a witness observed him putting his scuba tank and other diving equipment aboard.[1] Shortly thereafter, the Jenny Lee left the marina and Deborah was never seen alive again except by appellant.

Positive identification of the Jenny Lee was never again made until the early morning of May 12, 1982. Several persons recalled observing a boat similar to the Jenny Lee anchored at the mouth of the Talmadge River near Lakeview Castle an hour or two after the Jenny Lee had left the harbor. The state contended, but was never able to definitely establish, that the anchored boat belonged to appellant.

At trial, no evidence was produced that anyone but the appellant and Deborah observed the events that occurred between the time the boat left the marina until approximately 2 a.m. on May 12. At that time, a resident on the lakeshore thought

---

**1.** Testimony at trial from other scuba divers indicated it was more or less standard practice for divers to take diving equipment on a boat even if not intending to dive. This apparently is done out of habit and for safety reasons.

he saw a flare over the lake while driving home, and later another flare after he arrived at his home. He notified the Coast Guard. By use of binoculars, this person spotted a small boat moving towards shore, and also heard someone shout "help." At about the same time, an outgoing vessel reported sighting of flares and a small craft flashing what appeared to be a beam light from a position approximately .8 mile from shore and 7.9 miles from the Duluth entry of the lake. This outgoing vessel likewise advised the Coast Guard which then sent a boat to investigate. The search boat reached the Jenny Lee, anchored 50 yards off shore near the Lakeview Castle, at 2:44 a.m. No one was then aboard.

At approximately 2 a.m. the operator of a motel adjacent to the Lakeview Castle was awakened by appellant who stated he needed help because his wife was out on the lake. Appellant was wearing a diving suit and was wet from the swimming in from the boat anchored off shore. From the motel, the sheriff's rescue squad was called.

Two St. Louis County deputy sheriffs arrived at the motel at 2:45 a.m. and found appellant in front of the motel. Using a radio, they relayed information he gave them about the events of the evening to the Coast Guard search boat out on the lake.

Appellant did not testify at trial. One of the deputies who questioned appellant in the patrol car testified that appellant told him that as his wife and he were cruising approximately one mile out from the Lakeview Castle, a leak developed in the water jacket of the engine. The cause of the leak was a bolt which had come loose from the water jacket. The bolt was taped back into the water jacket to restrict the flow of water. After the repair, which appellant said was completed between 8 and 9 p.m., he attempted to restart the boat's motor. He was unsuccessful and thought the engine was flooded. Appellant claimed he activated the bilge pump to pump out water which had entered the boat from the leak. When he did so, the pump made a sucking noise on the floor of the boat. He said this caused Deborah, an excitable and strong-willed person with a great fear of water, to become hysterical. She allegedly thought the pump was pulling the bottom of the boat loose. Appellant claims she then insisted on getting into a life raft and leaving the boat. Before doing so, however, she assisted him into his dry suit.

Race also told the deputies he had two life rafts on board, both of which were two-person, yellow and blue rubber rafts. He further claimed he had attempted to blow up the first raft. Because it would not hold air, he "left that one on the boat" and blew up the second raft. He claimed Deborah got into the second raft, but when he attempted to get into the raft with her, it took on some water. This, he asserted, caused Deborah to become frightened, and she refused to let him into the raft.

Appellant then related that he started towing the raft to shore by swimming. He said he eventually became cold due to his failure to wear his diving gloves. He stopped towing to warm his hands. As he was rubbing them together, the raft, with Deborah in it, drifted away. After yelling to her to head towards shore, he swam back to the boat, the lights of which were still visible, and signaled for help with flares. An attempt to start the engine was immediately successful and it ran fine. After cruising in the boat for approximately 20 minutes in an unsuccessful search to locate his wife and the raft, he decided to go to shore for help. He estimated he was in the water three hours from the time he lost contact with Deborah and the life raft and the time he got back to the boat. When asked if he had a scuba tank aboard, he denied that he did.

Meanwhile, out on the lake, the Coast Guard and the Civil Air Patrol were making a search for the raft and for Deborah, based on appellant's information relayed to them by the sheriff's deputies. Deteriorating weather conditions hampered the search, as well as a lack of any definite information concerning the time and place Deborah entered the water. The search was unsuccessful. It wasn't until late that

afternoon that a schoolboy found Deborah's body washed up on shore considerably south of the area of search.

Examination of the Jenny Lee on the morning of May 12 revealed from 2 to 4 inches of water in the bottom. Officers estimated approximately 40 to 50 gallons of water lay below the floorboards in the bilge area. They encountered no problem in starting the engine, but water was observed coming from the engine during operation. It measured 1 gallon every 1.25 minutes, or 48 gallons per hour. Undisputed testimony confirmed that even with a leak of this magnitude, the boat was in no danger of sinking. Upon testing, the bilge pump worked properly, and had the capacity to remove 300 gallons of water per hour from the boat.

On board the Jenny Lee, officers found a blue and yellow rubber life raft with numerous cuts in several areas, including both air chambers. The cuts were all on the underside of the raft and gave the appearance of having been made with an upward thrust of a knife-like instrument while the raft was inflated. Most of the cuts in the raft's bottom appear as if they might have been made by an instrument about the size of a diver's knife. Trial testimony established that appellant owned two diver knives, but neither of the knives was found in the boat on May 12 or was otherwise accounted for.

During the boat inspection on May 12, officers noted several gallons of water still in the cut rubber life raft. In his original statement to the deputy sheriffs, appellant had specifically stated that following his unsuccessful attempt to inflate it, the raft had not been in the water. In a later statement, appellant altered his story and said that he had thrown that raft overboard. On the morning of May 12, both caps to the air chambers of the raft were securely closed, notwithstanding appellant's indication that following the unsuccessful attempt to inflate the raft, he had thrown it aside.

Appellant's various statements concerning the raft were inconsistent. He maintained two life rafts were on board, that one could not be inflated, that he tossed it aside, and that it was never in the water—a statement later changed. At first he claimed he had no scuba tank aboard, but later admitted he did and had used it to inflate the raft. No scuba tank was found on May 12. Appellant could not account for its absence. Although he had his diving equipment on board, neither of the diving knives was found.

At a trial which focused on the existence or nonexistence of an alleged second raft, these inconsistencies were a major factor in resolving the issue. The state posited that the slashed life raft found on the Jenny Lee was the only raft; that Deborah had been in that raft; that while Deborah was afloat in the raft on Lake Superior, appellant had cut the raft out from under her by swimming under the raft and puncturing it with his diver's knife, knowing that hypothermia inexorably would kill her in a relatively short time.

The slashed life raft had been loaned to appellant by a diving partner about two years earlier. At the trial, appellant's brother and his young daughter testified to knowing that appellant possessed a second raft. Although from the outset it was obvious to all the existence of a second raft was of crucial importance in resolving what happened on the fateful night, neither of the two witnesses had mentioned the alleged second raft's existence until shortly before trial which occurred one year and a half after Deborah's death.

On May 12 and immediately thereafter, a comprehensive effort was made to locate the alleged second raft. Notwithstanding extensive radio, television and newspaper media attention given to the search for the "other" blue and yellow rubber raft, no one reported sighting or finding such a craft. Trial evidence established that a raft similar to that found on the boat, with pockets of air in it, would be virtually unsinkable. Because of the intensity of the search for the raft, one of the search officers went so far as to testify at trial that had any "other" raft existed, it would have been found.

Many witnesses who testified at trial, who were on or near Lake Superior on May 11–12, 1982, and who have been on or near the lake since, indicated they had neither seen, found nor heard of anyone else who had seen or found any other blue and yellow rubber raft.

In support of its contention that defendant had murdered his wife, the state suggested two possible motives. First, the state presented evidence Larry Race did not love his wife despite his appearance of being a family man. While Race was likeable, generous and compassionate, and had never been observed by any testifying witness to have treated Deborah in a mean or cruel manner, he also engaged in extramarital affairs with at least four women since 1976. The longest affair lasted from 1976 until the weekend before Deborah's death. Two of these women testified that appellant complained to them about his wife—that she was overweight, that she spent too much money, and that she was a poor housekeeper. The state likewise produced testimony indicating that after Deborah's death, appellant contacted each of these two women and suggested, explicitly or implicitly, that if questioned by officers, they should state their relationship with him had been no more than friendship.

Secondly, the state contended that appellant had a financial motive for causing Deborah's death. At the time of her death, her life was insured for approximately $108,000. Of that amount, approximately $37,000 involved credit life insurance policies that paid off a home mortgage and personal loans of the parties. The state produced testimony indicating, that with few exceptions, in the past it had not been appellant's practice to purchase credit life insurance on the life of either himself or his wife. All the life insurance policies on Deborah had been written within seven months of her death. While at trial the state conceded lack of evidence to give rise to an inference that appellant purchased the life insurance with his wife's murder in mind,[2] it nevertheless contended that once the insurance on Deborah's life was purchased, it provided a powerful incentive for uxoricide.

Appellant's conviction of murder in the first degree was based solely on circumstantial evidence. He contends the trial evidence was insufficient to support the jury's verdict of guilty. As we have previously stated:

> The circumstantial evidence in a criminal case is entitled to as much weight as any other kind of evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt.

*State v. Jacobson,* 326 N.W.2d 663, 666 (Minn.1982) (citing *State v. Morgan,* 290 Minn. 558, 561, 188 N.W.2d 917, 919 (1971); *State v. Kaster,* 211 Minn. 119, 121, 300 N.W. 897, 899 (1941)). *See also State v. Ngoc Van Vu,* 339 N.W.2d 892, 898 (Minn. 1983); *State v. Threinen,* 328 N.W.2d 154, 156 (Minn.1983); *State v. Gibbons,* 305 N.W.2d 331, 336 (Minn.1981); *State v. Swain,* 269 N.W.2d 707, 712 (Minn.1978).

We set forth the general standard for reviewing a jury verdict in a criminal case where the claim on appeal is insufficiency of the evidence in *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981):

> In reviewing a claim of sufficiency of the evidence we must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill,* 274 N.W.2d 99 (Minn.1978). The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Wahlberg,* 296 N.W.2d 408 (Minn.1980).

*See also State v. Taylor,* 258 N.W.2d 615, 622 (Minn.1977); *State v. Bagley,* 286 Minn. 180, 186, 175 N.W.2d 448, 453 (1970);

---

**2.** There was evidence that with respect to at least one of the policies—the mortgage insurance policy, the institutions had sought out appellant to sell it to him.

*State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). The stricter standard of appellate review of a conviction based on circumstantial evidence still recognizes a jury is in the best position to evaluate the circumstantial evidence surrounding the crime, and its verdict is entitled to due deference. *State v. Anderson,* 379 N.W.2d 70, 75 (Minn.1985); *State v. Linder,* 304 N.W.2d 902, 906 (Minn.1981). Before sustaining the verdict, the reviewing court must conclude that the jury, acting with due regard for the presumption of innocence and the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably have found the defendant was proven guilty of the offense charged. *State v. Ibarra,* 355 N.W.2d 125, 129 (Minn. 1984); *State v. Turnipseed,* 297 N.W.2d 308, 313 (Minn.1980); *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978); *State v. Combs,* 292 Minn. 317, 320, 195 N.W.2d 176, 178 (1972); *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

The thrust of appellant's insufficiency argument is that the facts fail to support a specific theory of the crime as advanced by the prosecution. The state theorizes that after getting Deborah out on the lake in his boat and playing upon her fears and her inability to swim, appellant convinced her that the boat was sinking and that he could save her in the same manner as he had saved his two children before; that once she was in the life raft, he pushed her some distance from the boat and then swam back to the boat, put on his scuba tank, located the raft in the lake, swam under it, cut it out from under her, and swam back to the boat with the raft; and that he then waited on the boat several hours before seeking rescuers.

Race asserts that time factors associated with this theory make it impossible, or at least highly improbable, that the boat sighted by witnesses near the Talmadge River could have been the Jenny Lee and make it impossible that Deborah's body could have reached shore where it did, as soon as it did. He further argues that the state's theory is implausible because the likelihood of finding Deborah on a life raft out on the lake at night, after he returned to the boat for the scuba tank, would be akin to finding a needle in a haystack.

■ We acknowledge that appellant's criticism of the weaknesses in the state's theory are not without some merit. If the jury had accepted the state's theory uncritically, reason to question its verdict would exist. However, the appellant's criticism rests on the assumption that time factors associated with the events of the evening were accurately determined. In fact, they were not. For example, no evidence at trial with any specificity indicated clearly the point on the lake and the time Deborah entered the life raft, nor was there any specificity with respect to the time and place she was left alone in the raft. Our decisions make clear that for a convicted criminal to successfully challenge a verdict based on circumstantial evidence, he must show that his claim is consistent with a rational hypothesis other than guilt. Our cases do not require that the evidence be consistent only with a specific theory advanced by the prosecution.

■ After careful examination of the record, we conclude the evidence supports the jury's verdict. The crucial issue was the existence or nonexistence of a second life raft on the boat on May 11. On conflicting evidence, the jury, whose task it was, concluded there was only one life raft on board. From that it follows that the only rational inference to be drawn from the circumstantial evidence is that appellant murdered his wife. Extensive efforts to locate the second life raft were unsuccessful, notwithstanding evidence that if such a raft existed, it would have most probably been located. Significant inconsistencies in appellant's statements to authorities substantially diminished the credibility of his assertion of the existence of two rafts, so the jury had "substantial grounds to doubt the veracity of [the defendant's] story." *State v. Langley,* 354 N.W.2d 389, 394 (Minn.1984).

■ 2. Appellant also seeks a new trial claiming he was denied his constitutional

right to effective assistance of counsel. Under the sixth amendment to the United States Constitution, a criminal defendant is entitled to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). For an accused to prevail on this claim, a showing must be made (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 104 S.Ct. at 2064. Moreover, the accused must demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* 104 S.Ct. at 2068.[3]

■ We examine, then, appellant's claims. First, he argues that his counsel generated significant prejudicial error when he stated during the closing argument:

Ladies and Gentlemen, you were on voir dire, when you were being examined to be jurors in this case, each of you were told by Judge Litman, individually, as well as a panel, generally what the law of this case would be. He told you that this defendant, Larry Race, was presumed innocent. And, he enjoyed that presumption of innocence, I respectfully submit, even through this argument and right up to the time the judge has instructed you on the law and you begin your deliberations. At that time, ladies and gentlemen, you have to apply the law as the judge will give it to you, and *you must find Larry Race guilty of murder in the first degree.* You're not going hear (sic) murder in the second degree or any other charge. *You must find him guilty of murder in the first degree,* and that he did premeditate with intent to bring about the death of Debra

(sic) Race by immersing her in the waters of Lake Superior on about the 11th day of May, 1982.

(Emphasis added).

Appellant contends the emphasized words would lead the jury to conclude either that appellant had conceded guilt or that his attorney knew appellant was guilty and felt he either was ethically required to ask the jury for conviction or he made a Freudian slip of the tongue. We reject this contention. It is purely speculative and clearly unsupportable when counsel's entire closing argument is considered. In that closing summation, counsel was thoroughly critical of the prosecutor's theory of the case, characterizing it as being "absolutely preposterous" and "fundamentally flawed," and concluded by a plea asking the jury to end the tragedy and "send Mr. Race home to his family."

■ Secondly, appellant asserts that because his attorney waived his opening statement, appellant was deprived of effective assistance of counsel. Initially, counsel, in accordance with Minn.R.Crim.P. 26.03, subd. 11, elected to reserve his opening until completion of the state's case. The prosecution presented 2½ weeks of evidence before resting. Defense counsel then concluded that, since he had relied extensively on cross-examination to lay out the defense position, an opening statement at that point would be largely superfluous and time consuming to no beneficial end. Considering that many of the prosecution's witnesses were not unfriendly to appellant, and that counsel had been able to extract much favorable testimony from them by cross-examination, the decision to waive the opening statement seems reasonable, and certainly fails to meet the *Strickland* tests. Clearly, the waiver, beyond a reasonable doubt, was unprejudicial.

During the course of this lengthy trial, defense counsel frequently objected to evidence proffered by the prosecution. Some of the objections were overruled; others

---

**3.** We have recognized the *Strickland* standards. *See State v. Eling,* 355 N.W.2d 286, 293 (Minn. 1984).

were sustained. Appellant here alleges he was prejudiced by counsel's unsuccessful evidentiary objections because the jury may have concluded that the defense was in a state of surprise at the facts being produced, and that the defense did not want the jury to hear the facts. A review of the trial record demonstrates this allegation to be clearly meritless.

■ Finally, appellant claims ineffective cross-examination of prosecution witnesses amounted to denial of effective assistance of counsel. The gist of this contention is that since appellant was convicted, the cross-examination must have been ineffective. Effectiveness of counsel does not hinge upon whether a favorable result was obtained. *See, White v. State,* 309 Minn. 476, 481, 248 N.W.2d 281, 285 (1976). A review of the trial transcript corroborates the observation of the trial judge in the post-conviction hearing memorandum that defense counsel "conducted a thorough and effective examination of potential jurors and witnesses."

Thus, we find no merit in appellant's claims he was denied effective assistance of counsel.

■ 3. Lastly, appellant claims statements made by the prosecution during the course of final argument deprived him of a fair trial by pointing up the fact that the defense had failed to present evidence to rebut the state's theory of the crime. By isolating and highlighting four separate statements during the course of a lengthy closing argument, appellant contends the argument shifted to him the burden of proof. Throughout the trial of a criminal case, the state has the burden to prove all elements of the crime beyond a reasonable doubt, and the burden of proving his innocence cannot be shifted to an accused. *See State v. Brechon,* 352 N.W.2d 745, 748 (Minn.1984); *State v. Townsend,* 259 Minn. 522, 529, 108 N.W.2d 608, 613 (1961). The prosecutor may not shift the burden of proof to the accused by commenting about his failure to call witnesses or to present evidence. *State v. Caron,* 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974); *State v.*

*White,* 295 Minn. 217, 225, 203 N.W.2d 852, 858 (1973); *State v. Bell,* 294 Minn. 189, 192, 199 N.W.2d 769, 771 (1972).

■ The four complained of comments all remarked upon the lack of evidence to substantiate appellant's claim that vandalism was the source of the cuts or slits on the life raft found in the Jenny Lee on May 12, 1982. However, the claim the life raft had been vandalized was part of the defense rebuttal theory. The prosecutor's remarks concerning the lack of, or paucity of, evidence of vandalism, then, is viewed as not shifting burden to the defense, but rather as challenging one of the defense's rebuttal theories. Though the prosecutor's argument may not be a model of propriety, we cannot say he overstepped the bounds of propriety to the extent of requiring a new trial. *See State v. Curtis,* 295 N.W.2d 253, 258 (Minn.1980); *State v. Kost,* 278 N.W.2d 46, 48 (Minn.1979); *State v. Prettyman,* 293 Minn. 493, 495, 198 N.W.2d 156, 158 (1972).

■ Appellant makes no claim the prosecutor's comments constituted deliberate and intentional misconduct. Accordingly, even if the comments by the prosecutor can be reviewed as improper, when the conduct is unintentional, the test we apply is to determine whether the statements likely played a substantial role in influencing the jury's decision. In this case, we can ascertain no such role. Prosecutorial error 'is curable by corrective instructions. *See State v. Caldwell,* 322 N.W.2d 574, 590 (Minn.1982); *Tucker v. State,* 309 Minn. 482, 489, 245 N.W.2d 199, 203 (1976). The trial court, in its final instructions, reiterated that the burden of proving guilt rests with the state and that the defendant has no burden of proving innocence. Moreover, at least twice during the trial, the court informed the jury that, if statements of counsel on the applicable law conflicted with those instructions on the law given by the court, the jury was to disregard counsel's statements.

After carefully considering the record, we hold the evidence was sufficient to sus-

tain the jury's verdict; that appellant was not deprived of his constitutional right to effective representation; and that any prosecutorial misconduct that may have occurred was cured by proper instructions by the trial court. Accordingly we sustain the conviction.