**Larry Gene RACE, Petitioner, Appellant,**

v.

**STATE of Minnesota, Respondent.**

**No. C2-87-539.**

Supreme Court of Minnesota.

Dec. 24, 1987.

cutor committed prejudicial misconduct in closing argument.

The evidence presented at trial is summarized in detail in our earlier opinion. Briefly, petitioner took his wife out to dinner on the evening of May 11, 1982, to celebrate their 14th wedding anniversary, then took her for a ride on Lake Superior in his 22–foot cabin cruiser. At 2:00 a.m. on May 12 petitioner, wearing a so-called dry suit, appeared at a motel adjacent to the Lakeshore Restaurant at which they had dined, woke the operator of the motel, and said he needed help rescuing his wife, who was out on the lake. Petitioner told authorities that a leak had developed in the water jacket of the engine and that when he activated the bilge pump to pump out water his wife had become hysterical and insisted on getting into a life raft and leaving the boat. He said that he had tried to inflate one of the two rafts on board the cruiser but that, when it would not hold air, he inflated the other one. He said that Deborah got in the raft, which took on some water, and he, wearing his dry suit to protect him against hypothermia, began towing the raft.toward shore by swimming. He said that when he stopped towing to warm his hands, the raft drifted away out of reach. He said that after he yelled at Deborah to head towards shore, he swam back to his boat and began setting off flares.

A search for the raft and for Deborah Race was unsuccessful. Later, in the afternoon, a school boy found Deborah's body washed up on shore. An autopsy revealed that she had died of immersion hypothermia resulting from exposure to the 35° to 37° Fahrenheit water.

Authorities who examined the boat found that the engine worked, that it did take on water but that the bilge pump worked and had the capacity to remove the water and that the boat had.been in no danger of sinking. The officers found a blue and yellow raft on the boat; several gallons of water were still in the raft and there were numerous cuts on the underside of the raft giving the appearance of having been made

David W. Larson, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan L. Mitchell, Co. Atty., John E. DeSanto, Asst. Co. Atty., Duluth, for respondent.

## OPINION

COYNE, Justice.

This is an appeal by Larry Gene Race (hereafter "petitioner") from an order of the district court denying a petition for postconviction relief in the form of a new trial based upon a claim of newly discovered evidence. We affirm.

In 1983 petitioner was found guilty by a district court jury of first-degree murder in the death of Deborah Race, his wife and the mother of his three children. Petitioner was sentenced to life imprisonment. We affirmed his conviction in *State v. Race*, 383 N.W.2d 656 (Minn.1986), against claims that the evidence of his guilt was insufficient, that his counsel failed to represent him effectively at trial, and that the prose-

with an upward thrust of a diver's knife while the raft was inflated.

It was the state's theory at trial that the second raft never existed, that the victim had gotten into the raft that the officers later found on the boat and that petitioner, wearing his dry suit, had swum under the raft and punctured it, knowing that once Deborah was in the water she would die from immersion hypothermia in a relatively short time. As we stated in our earlier opinion, inconsistencies in petitioner's various statements concerning the raft found in the boat were a significant factor in resolving the issue of the existence or non-existence of a second raft. 383 N.W.2d at 660. While petitioner's brother and his young daughter testified to knowing that petitioner possessed a second raft, neither of them had mentioned this until shortly before trial, which commenced 1½ years after the victim's death. *Id.* And, of great significance, the second raft was never found. As we stated in our opinion:

> On May 12 and immediately thereafter, a comprehensive effort was made to locate the alleged second raft. Notwithstanding extensive radio, television and newspaper media attention given to the search for the "other" blue and yellow rubber raft, no one reported sighting or finding such a raft. Trial evidence established that a raft similar to that found on the boat, with pockets of air in it, would be virtually unsinkable. Because of the intensity of the search for the raft, one of the search officers went so far as to testify at trial that had any "other" raft existed, it would have been found. Many witnesses who testified at trial, who were on or near Lake Superior on May 11–12, 1982, and who have been on or near the lake since, indicated they had neither seen, found nor heard of anyone else who had seen or found any other blue and yellow rubber raft.

383 N.W.2d at 660–61.

In November of 1986 petitioner filed this petition for postconviction relief based on newly discovered evidence. The newly discovered evidence consisted primarily of the testimony of two persons, Theresa Styniski and Hugh Bernhardt. A Duluth television station had broadcast a documentary about petitioner's case in October and Styniski had called the reporter the next day claiming that she and Bernhardt had information about the second raft. At the hearing on the petition, Styniski and Bernhardt, who are close friends, testified that in 1982, at the time the search for the raft was being conducted by the authorities, they saw a raft on the beach behind Fitger's Brewery in Duluth. This beach is a popular fishing spot, particularly in the spring and fall. They testified that the raft was a blue and yellow raft identical to that described by petitioner and, that it was filled with sand and small rocks. They testified that Bernhardt made long cuts in it with his knife, hoping that it would drift away as the sand and small rocks drained out of it. They testified that it remained on the beach for a period of anywhere from 1 week up to a month. Dan Hatfield, a friend of theirs, testified that he could vaguely remember seeing the raft with Bernhardt but could not remember what it looked like or when he saw it. Styniski's mother and two friends of Styniski and Bernhardt testified that they recalled Styniski and/or Bernhardt speaking about having seen the raft.

Generally, in order to obtain a new trial on the ground of newly discovered evidence, the defendant must establish (1) that the evidence was not known to him or his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to lack of diligence, (3) that the evidence is material (or, as we have sometimes said, is not impeaching, cumulative or doubtful), and (4) that the evidence will probably produce either an acquittal at a retrial or a result more favorable to the petitioner. Compare *State v. Swanson*, 353 N.W.2d 128, 130 (Minn.1984), with *Berry v. State*, 364 N.W.2d 795, 796 (Minn. 1985). The decision whether to grant a new trial based upon a claim of newly discovered evidence rests in the first instance with the trial court and we will not disturb the decision unless there is an abuse of discretion. *Berry v. State*, 364 N.W.2d 795, 796 (Minn.1985).

In this case the trial court determined that the evidence in question was of doubtful credibility and that therefore petitioner had not established that the evidence would probably produce a result more favorable to petitioner at a retrial. Considering the content of the testimony of the witnesses at the postconviction hearing and bearing in mind that the trial court had the opportunity to observe the demeanor of the witnesses when they testified, we conclude that the trial court did not abuse its discretion in denying petitioner a new trial.

The testimony of Styniski, Bernhardt and Hatfield was vague and contradictory. For example, Bernhardt initially told the defense investigator that he found the raft in October but he changed this when he was reminded by the defense investigator that Deborah Race's death occurred in the spring. Hatfield could only vaguely remember seeing a raft, saying that it was in the spring but that he was not sure of the year. Hatfield could not recall the size or color of the raft. The testimony of Styniski and Bernhardt that the raft was identical to that described by petitioner may have been colored by the fact that the defense investigator showed them both a picture of the raft found on the boat, asked them if the raft they saw looked the same and, when they said yes, told them, "That's good, that's real good."

The reasons given for not coming forward earlier also were incredible. Hatfield testified that he never really gave much thought to reporting what he had seen to the police even when he later learned that petitioner had been convicted and sentenced to life in prison. Bernhardt attributed his failure to report the sighting to the fact that at the time of the sighting he had been "laying low for about a year" because of warrants for his arrest for fish and game violations. In fact, no warrants were issued for his arrest until December of 1982. Styniski's general credibility was further cast in doubt by her admission on cross examination that she had lied to sheriff's deputies as to Bernhardt's whereabouts when they came to her residence in July of 1983 to execute a warrant for Bernhardt's arrest.

Finally, the testimony by Styniski's mother and the two friends of Styniski and Bernhardt that they had heard Styniski and Bernhardt talk about the raft was not the sort of corroborating evidence that would assuage any doubt that the trial court had as to the credibility and reliability of the testimony of Styniski, Bernhardt and Hatfield.

Given the doubtful character of the evidence, bearing in mind that the trial court had the opportunity to observe the demeanor of the witnesses, and considering the evidence of guilt that would be produced at a retrial,[1] we conclude that the trial court did not abuse its discretion in denying petitioner a new trial.

Affirmed.

---

1. The state's evidence would include, in addition to that produced at the first trial, the testimony of William Rupright, a close friend of petitioner who had helped petitioner repair his boat and had been on the boat on several occasions. Rupright testified at an earlier postconviction hearing that he had no knowledge of the second raft and was surprised petitioner claimed he had a second blue and yellow raft. Rupright testified that because of his surprise he went to petitioner's house immediately after Deborah's funeral and, despite the obvious poor timing of the question, asked petitioner, "Where in the world did the second raft come from?"