**STATE of Minnesota, Respondent,**

v.

**Lanny David GREEN, Appellant.**

No. A06–218.

Supreme Court of Minnesota.

May 1, 2008.

John M. Stuart, State Public Defender, Steven P. Russett, Assistant State Public Defender, Office of the State Public Defender, St. Paul, MN, for Appellant.

Lori Swanson, Attorney General, Tibor M. Gallo, Assistant Attorney General, St. Paul, MN, Lamar T. Piper, Watonwan County Attorney, St. James, MN, for Respondent.

OPINION

PAGE, Justice.

In September 2004, appellant Lanny David Green was charged by complaint with second-degree criminal sexual conduct based on a claim that he had touched the genitalia of four-year-old E.Q. in early July 2004 at a picnic at Long Lake in Watonwan County. On the first day of trial, the State was permitted to amend the complaint to add a charge of first-degree criminal sexual conduct. The jury found Green guilty of both offenses, and the court of appeals affirmed. We granted review to consider whether the interests of justice require that Green receive a new trial. Underlying this question is Green's claim that evidence introduced at trial—in the form of an incorrectly transcribed statement Green made to the police—denied him a fair trial. For the reasons discussed below, we conclude that the interests of justice do not require that Green receive a new trial, and therefore affirm.

The facts relevant to this appeal are as follows. In July of 2004, E.Q.'s mother let Green take E.Q. to a picnic Green's family held at Long Lake. During that picnic, Green and E.Q. were seen entering a changing shed together after they had finished swimming, where they remained for about 15 minutes with the door closed. According to E.Q.'s mother, when E.Q. returned home that evening E.Q. was acting quiet and scared. When asked what was wrong, E.Q. initially said she did not

want to talk about it. Eventually, E.Q. told her mother that Green had "opened her up and touched her in the private." As part of the subsequent police investigation, the police conducted a taped interview with Green. During that interview, Green indicated that after swimming at the picnic he took E.Q. into a changing shed and helped her out of her swimsuit. At some point, Green decided that he was going to check to make sure E.Q.'s genital area was clean. When asked what he meant when he indicated that he wanted to make sure that E.Q. was clean, Green said that he "just checked to make sure [there] wasn't * * * anything in her privates." Describing his actions, Green stated:

> Well I just kind of went like that, I did open her up a little bit, but * * * I wasn't trying to offend her or anything, I told her * * * I was just gonna check and make sure she was clean, or there wasn't any sand or whatever * * * in there [that] could cause a rash.

According to the transcript of the interview, the following exchange also took place:

> Officer: [W]here just exactly did you put your two fingers?
>
> Green: Well I, oh I don't know, I suppose in, I can't remember if it was this way or that way, but * * * she was on the couch and probably this way and just I checked to make sure there wasn't anything you know by the top part.

As a result of the police investigation, Green was charged with second-degree criminal sexual conduct. To prove that offense, the State was require to prove beyond a reasonable doubt that Green had sexual contact with E.Q.[1] Green's jury trial commenced on September 14, 2005. That morning, the State moved to amend the complaint to add a charge of first-degree criminal sexual conduct, which required the State to prove beyond a reasonable doubt that Green had sexually penetrated E.Q.[2] According to the State, it sought to amend the complaint based on witness statements indicating that Green had sexually penetrated E.Q. The district court granted the State's motion.

In his opening statement, the prosecutor told the jury that the State would present evidence that Green had admitted to " 'opening [E.Q.] up' " and to having "just 'cleaned her out.' " The prosecutor did not refer to any specific admission by Green that he had put his finger "in" the victim. During defense counsel's opening statement, however, the jury was told that it would

> probably also hear, and maybe even get a copy of, Mr. Green's statement to the police where he talked to them * * * and he described to them in his words what he did. He said, "Well, I—oh, I don't know, *I suppose in*, I can't remember if it was this way or that way * * * and just I checked to make sure there wasn't anything, you know, by the top part."

(Emphasis added.)

At trial, E.Q.'s mother, testifying for the State, testified that E.Q. had gone swim-

---

1. "Second-degree criminal sexual conduct" is defined, in relevant part, as sexual contact with an individual under 13 years of age by an actor more than 36 months older than that individual. Minn.Stat. § 609.343, subd. 1(a) (2006). "Sexual contact" is defined, in relevant part, as the intentional touching of an individual's intimate parts committed with aggressive or sexual intent. Minn.Stat. § 609.341, subd. 11(a)(i) (2006).

2. "First-degree criminal sexual conduct" is defined, in relevant part, as sexual penetration of an individual under the age of 13 by an actor more than 36 months older than that individual. Minn.Stat. § 609.342, subd. 1(a) (2006). "Penetration" is defined as any intrusion, however slight, into a genital opening by any part of the actor's body. Minn. Stat. § 609.341, subd. 12(2)(i) (2006).

ming with Green at a picnic. After the picnic, E.Q. was "very quiet, very shook[ ] up, very scared." When asked what had happened, E.Q. told her mother that Green had "opened her up and touched her in the private." According to E.Q.'s mother, when asked to clarify where she had been touched, E.Q. "pointed to her inside." When asked again what had happened, E.Q. claimed that Green "opened her up and touched her," and pointed to her genital area. On cross-examination, E.Q.'s mother again said that E.Q. had told her that Green "opened her up and touched her" and that the child had pointed to her genital area instead of saying whether she had been touched on the outside or inside.

Deputy Jeremy Nachreiner next testified regarding his interview with Green. Nachreiner testified that Green admitted to helping E.Q. change out of her swimsuit and to "open[ing] her up a little bit and check[ing] to make sure there was no sand or any rashes." During his testimony, Nachreiner referenced the transcript of his interview with Green, but did not say that Green had admitted to putting his fingers inside E.Q. On cross-examination, the defense successfully moved, without objection, to admit the entire transcript of the interview into evidence. The actual tape recording of Green's interview with Deputy Nachreiner was never offered or received into evidence. Using the transcript, defense counsel highlighted responses by Green indicating that Green had touched E.Q. "just on the sides" and on "just the top side."

Christian Archerd, Green's former girlfriend, also testified for the State. Archerd had attended the picnic and observed Green and E.Q. enter the changing shed together after they had finished swimming. She testified that the two stayed inside the shed for about 15 minutes with the door closed.

Two other witnesses for the State testified to statements they heard Green make about the incident. Lisa Smith stated that Green told her about the incident in the changing shed, and that he admitted that he "cleaned [E.Q.] out." Smith further testified that Green said that he had "clean[ed] her up [to] make sure that there was nothing in there." Smith went on to say that Green admitted that he "opened her up and cleaned her out, or something like that. * * * He said he used his fingers, or finger, or something, to clean her out, you know." Stephanie Morey testified that Green told her that "he had opened [E.Q.] up to make sure there was no sand inside of her."

The State also elicited testimony from Robert Young of the Watonwan County Sheriff's Office regarding a search conducted of Green's house. During that search, nude photographs of children were discovered in Green's bedroom and on various computers located in the house. The discovery of child pornography in Green's house was significant because, according to Young, research has shown a link between child molestation and the possession of child pornography.

The defense called both Green's mother and Green himself as witnesses. Green's mother testified that Green told her only that he "had checked to see if [E.Q.] was clean." She also admitted, though, that she had previously informed a law enforcement officer that Green had told her that he had "wiped [E.Q.] out."

In his testimony, Green explained that after swimming, he took E.Q. into a changing shed at the lake, helped her change her clothes, and checked "the top part" of her vagina to make sure it was clean. When asked what he meant when he told Deputy Nachreiner that he had "opened her up a little bit," Green explained that he meant he had only opened "the top part.

Just enough to see if there was any yeast infection, or anything like that." He denied ever using his finger to clean E.Q. out, and, on cross-examination, denied having told anybody that he had done so.

On cross-examination, the State impeached Green using his transcribed interview with Deputy Nachreiner. After reciting Deputy Nachreiner's question asking where Green had put his fingers, the prosecutor had Green read his response from the transcript "word for word." Green then read, "Well, I—oh, I don't know. I suppose in. I can't remember if it was this way, or that way, but she was on—she was on the couch, and probably this way, and just I checked to make sure there wasn't anything, you know, by the top part." When the prosecutor asked what he meant by "I suppose in," Green responded that he was not referring to E.Q. at all, but was only explaining "in what direction." Green did not deny or otherwise claim that he had not said "I suppose in" during the interview or that any other part of his answers to Deputy Nachreiner's questions was transcribed inaccurately.

In his closing argument, the prosecutor noted that Green never disputed having touched E.Q. and, pointing to Green's multiple explanations for what he had done, argued that if Green had been telling the truth, he would have been able to articulate a reason for his actions. As evidence of Green's sexual intent, the prosecutor pointed to the child pornography found in Green's house.

The prosecutor also engaged in an extensive discussion on the issue of penetration. First, the prosecutor noted that any intrusion, however slight, into a genital opening constitutes penetration. The jury was then reminded of the testimony that Green had told others that he had cleaned out E.Q. with his fingers. On that point, the prosecutor observed, "If you clean out your billfold, you are going to have to reach into it. If you clean out your refrigerator, you are going to go into it. You clean out your pocket, you are going to go into it." The prosecutor then stated:

> [P]erhaps the most telling evidence of penetration comes from the Defendant himself when he was talking back on August 23, 2004, to Deputy Nachreiner. And the deputy asked him, * * * "Where, just exactly, did you put your two fingers?"
>
> Mr. Green's response was, word for word now, "Well, I—oh, I don't know. I suppose in. I can't remember if it was this way or that way, but she was on—she was on the couch and probably this way. And just I checked to make sure there wasn't anything, you know, by the top part."
>
> "Where did you put your two fingers?"
>
> And he said, "I suppose in."
>
> In where?

Noting that Green had no good explanation for where he had put his fingers, the prosecutor said, "I would submit to you that you ought to take [Green] at his word when * * * he said, 'I suppose they went in.' I submit to you that there is no evidence whatsoever that they could be any other place in this case than that little girl's private area."

In his closing argument, defense counsel admitted that Green touched E.Q. in her genital area, but denied that he ever penetrated her. He further argued that E.Q. had not explicitly told her mother that penetration had occurred. Defense counsel also argued that the phrase "I suppose in" was not very clear and could have meant "in this fashion" as opposed to "inside." In addition, defense counsel argued

that Green's statements regarding "wiping out" E.Q. did not indicate penetration.

On September 16, 2005, the jury found Green guilty of both first- and second-degree criminal sexual conduct. On October 31, 2005, Green brought a motion for a new trial in the interests of justice, pursuant to Minn. R.Crim. P. 26.04, subd. 1(1)1, based on defense counsel's post-trial discovery that the transcript of Green's interview with Deputy Nachreiner that was introduced at trial had been incorrectly transcribed. Defense counsel argued that the transcript of Green's answer to the question regarding where he had put his fingers should have been read as "I suppose um." Defense counsel further argued that, because this statement was "the centerpiece of the State's case for the first degree charge," the interests of justice required that Green receive a new trial. As to why he had not discovered the transcription error before trial, defense counsel indicated that, although he was aware that the tape of Green's interview was available, he did not listen to it before trial because the initial charge was only for second-degree criminal sexual conduct, which did not require a showing of penetration. Defense counsel further indicated:

I am wishing that I had gone and listened to the tape. But, frankly, I don't know that it would have made any difference to me at that point because I wouldn't have been listening for the word "in" or "um." I would have been looking for evidence that could be relied on to establish sexual or aggressive intent. * * * I probably wouldn't have paid particular attention, * * * to whether Mr. Green said "um" or "in." It was not until the first degree charge was added that that became significant. By then it was too late.

In response to defense counsel's arguments, the State conceded that the transcript appeared to be erroneous, but argued that defense counsel was aware before trial that a charge of first-degree criminal sexual conduct was possibly forthcoming. The State also argued that there was ample witness testimony at trial indicating that Green had engaged in penetration of E.Q.

After listening to the tape of the interview, the district court denied the new trial motion, stating:

There is much testimony regarding "opening up" or "cleaning out" that was communicated certainly to others and not in the context of the tape or transcript or testimony that was referred to between Mr. Green and Mr. Nachreiner. * * * [T]herefore, the Court finds that the Defendant is not entitled to a new trial on that issue * * *.

Following the denial of the motion, Green appealed, claiming that the admission of images of child pornography at trial was error and that his attorney rendered ineffective assistance of counsel by introducing the erroneous transcript of his police interview. The court of appeals affirmed the conviction. *State v. Green,* No. A06–218, 2007 WL 1746684 (Minn.App. June 19, 2007). Green petitioned our court for review, raising the same issues he had raised at the court of appeals. We denied review on those issues, but granted review to consider whether the district court erred when it denied Green a new trial in the interests of justice.

■ Minnesota's rules of criminal procedure allow a new trial to be granted if "required in the interests of justice." Minn. R.Crim. P. 26.04, subd. 1(1)1. We review the denial of a motion for a new trial for an abuse of discretion. *State v. Fenney,* 448 N.W.2d 54, 62 (Minn.1989).

The State first argues that this appeal should be dismissed because Green did not file his motion for a new trial within the 15–day time period set forth in Minn. R.Crim. P. 26.04, subd. 1(3). Green does not dispute that his new trial motion to the district court was untimely. He argues, however, that the timeliness issue was not raised to the district court and has therefore been waived. Because the timeliness issue was not raised in the district court, we agree that it has been waived. *See State v. Roby*, 463 N.W.2d 506, 508 (Minn.1990) (declining to address issue raised for the first time on appeal).

In the past, in analyzing the "interests of justice," we have considered a number of factors.[3] We have considered the degree to which the party alleging error is at fault for that error. *Compare State v. Wembley*, 728 N.W.2d 243, 245–46 (Minn. 2007) (explaining that the interests of justice did not require consideration of defendant's argument regarding tape recording because defendant had "affirmatively requested" that the jury consider that recording for a "tactical reason"), *and White v. State*, 711 N.W.2d 106, 110–11 (Minn. 2006) (concluding that the interests of jus-

tice did not justify review when individual failed to challenge composition of jury at proper time), *with Commandeur LLC v. Howard Hartry, Inc.*, 724 N.W.2d 508, 512 (Minn.2006) (affording party "benefit of the doubt" in interests of justice when that party attempted to comply with time limits for appeal). We have also considered the degree of fault assigned to the party opposing the motion for new trial. *Compare State v. Scanlon*, 719 N.W.2d 674, 687 (Minn.2006) (declining to grant new trial in interests of justice because alleged prosecutorial errors "appear to be the result of oversight or mistake, not deliberate attempts to hide facts or surprise the defense"), *and State v. Clifton*, 701 N.W.2d 793, 800 (Minn.2005) (stating that, although prosecutor's comments were inappropriate, she did not use race to disparage defendant and her argument had basis in record, thus rendering reversal in interests of justice inappropriate), *with State v. Cabrera*, 700 N.W.2d 469, 475 (Minn.2005) (reversing in interests of justice based on "serious prosecutorial misconduct" in interjecting race into closing argument).

In addition, we have considered whether some fundamental unfairness to the defen-

---

3. In their briefs and oral arguments to us, the parties suggest that our decision should be guided by our jurisprudence on newly-discovered evidence. Green claims that we must apply the test set forth in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir.1928), *overruled by United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir.2004), applicable to newly-discovered evidence of falsified testimony. Under the *Larrison* test, a new trial is to be granted if: (1) the court is reasonably well-satisfied that the testimony in question was false; (2) without that testimony the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after trial. *Pippitt v. State*, 737 N.W.2d 221, 226–27 (Minn.2007). The State argues that the test set out in *Race v. State*, 417 N.W.2d 264, 266 (Minn.1987), for all other newly-discovered evidence should be applied. Under *Race*,

a new trial should be granted if: (1) the evidence was not known to the defendant or his counsel at the time of trial; (2) the failure to learn of the new evidence was not because of a lack of diligence; (3) the evidence is material; and (4) the evidence will probably produce an acquittal or more favorable result at a retrial. *Id.*

We decline to apply either of the tests advocated by the parties. First, we granted review under the interests of justice standard of Rule 26.04, subdivision 1(1)1, not under subdivision 1(1)5, which permits a new trial to be granted based on newly-discovered evidence. Moreover, because the tape recording of Green's police interview was in existence and made available to Green's defense counsel in advance of Green's trial, the post-trial discovery of the transcription error did not constitute newly-discovered evidence in the sense contemplated by either *Larrison* or *Race*.

dant needs to be addressed. *See State v. Allen,* 706 N.W.2d 40, 44 (Minn.2005) (considering defendant's *Blakely* argument in interests of justice because such argument was unknown to defendant and contrary to established case law at time it would have had to be raised); *Clifton,* 701 N.W.2d at 800 (taking into account fairness of defendant's trial aside from error); *see also State v. Osborne,* 715 N.W.2d 436, 441–42 (Minn.2006).

Finally, the grant of a new trial in the interests of justice appears to be reserved for extraordinary situations. *See In re Welfare of S.M.E.,* 725 N.W.2d 740, 744 (Minn.2007) (discussing the application of the interests of justice in exceptional cases); *Valencia v. Markham Co-op. Ass'n,* 210 Minn. 221, 226, 297 N.W. 736, 738–39 (1941) (discussing our hesitance to grant a new trial in the interests of justice except in exceptional cases).

■ Applying these considerations, we hold that the trial court did not abuse its discretion when it denied Green's motion for a new trial. Obviously, the State bears responsibility for the inaccurate transcription of Green's taped interview with Deputy Nachreiner as well as for its failure to discover that the transcript was inaccurate before it was provided to Green's counsel and used at trial. The State did not, however, withhold any information from the defense or attempt to exploit the inaccuracy in the transcript during its case-in-chief. In fact, the State did not refer to Green's erroneously transcribed statement in its opening statement, in its direct examination of Deputy Nachreiner, or at any other time during the presentation of its case.[4]

Green, however, bears responsibility for the admission of the inaccurate interview transcript into evidence. It was Green's defense counsel who, without having listened to the tape of the interview to verify the accuracy of Green's statement, put the inaccurate transcript in front of the jury during his opening statement. Evidently Green, who was present during the opening statement, did not bring this inaccuracy to his counsel's attention. His defense counsel then, while cross-examining Deputy Nachreiner, successfully moved to have the entire transcript of the interview, including the inaccurate statement, admitted into evidence. Further, when cross-examined about his statement, Green, the person in the best position to know what he had said during the interview, did not deny that he had said "I suppose in" or otherwise call attention to the transcript's inaccuracy. In light of these facts, we conclude, on balance, that Green bears the greater responsibility for the inaccurately transcribed statement's placement before the jury.

We also conclude, based on the record presented, that the admission of the inaccurately transcribed statement did not result in any fundamental unfairness to Green. First, the inaccurately transcribed statement was given by Green himself, and its proper content was peculiarly within his personal knowledge. Yet, as noted previously, when given the opportunity on cross-examination to deny saying "I suppose in," Green did not do so. Instead, he merely attempted to clarify what he meant when he used the word "in."[5] In addition,

---

4. It is also of some significance that the error in transcription was not so facially obvious as to render inexcusable the State's failure to discover it. Our independent review of the tape of Green's interview reveals that it is simply unclear what the transcribed word should actually be.

5. Because the facts are not before us, we have no occasion to consider how our analysis might differ if the State had introduced the inaccurate transcript into evidence for the purpose of exploiting Green's apparent admission either during *its* case-in-chief or during its cross-examination of Green. Further,

it is relevant to our fairness analysis that the erroneous statement likely had no significant impact on the jury's verdict, in light of the strength of the evidence presented against Green. *Cf. State v. Wright,* 726 N.W.2d 464, 478 (Minn.2007) (stating that, in harmless error analysis, appellate courts should consider impact of erroneously admitted evidence on verdict). Three individuals gave testimony indicating that Green had admitted "opening [E.Q.] up" or "cleaning her out." E.Q.'s mother also testified that E.Q. told her that Green had "opened her up and touched her in the private." Moreover, the similarity between the statements Green made to each of these individuals is striking, as is the similarity between those witnesses' testimony and Green's own statements—both to the police and at trial—that he had "opened [E.Q.] up" to make sure she was clean.

Finally, based on a careful review, we are satisfied that there is nothing in the record to indicate that this case falls into the category of exceptional cases requiring the grant of a new trial in the interests of justice. Although the State was responsible for the erroneous transcription of Green's taped police interview, the State did not engage in any misconduct with respect to the use of that transcribed interview. Further, we are satisfied that none of Green's constitutional rights were violated and that he received a fair trial.

Having concluded that, on balance, Green bears the greater responsibility for his inaccurately transcribed statement being put in front of the jury, that the admission of the inaccurate statement did not result in any fundamental unfairness to Green, and that this is not an exceptional case warranting a new trial, we hold that the district court did not abuse its discretion when it denied Green's motion for a new trial in the interests of justice.[6]

Affirmed.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, Paul H., Justice (dissenting).

I respectfully dissent. During Lanny David Green's trial for first- and second-degree criminal sexual conduct, an inaccurate transcript of Green's police interview was introduced into evidence. The effect of this transcription error was to turn a meaningless utterance into a confession of the key element distinguishing the two charges—sexual penetration versus sexual contact. Because I conclude that a conviction based on a typographical error is fundamentally unfair under the circumstances of this case, I would reverse Green's conviction for first-degree criminal sexual conduct and remand this case to the district court for further proceedings on that charge or, alternatively, for conviction and sentencing on the second-degree criminal sexual conduct verdict.

Before turning to the key issue in this case, I believe that it is both helpful and important to clarify what is not at issue. This case is not about whether Green committed and should be punished for a terri-

---

because Green took the stand, we have no opportunity to consider how our analysis might differ if Green had exercised his constitutional right to remain silent.

**6.** As a final matter, we note that by order of November 21, 2007, we deferred consider-

ation of a motion by Green to strike portions of the State's brief and appendix. Because none of the challenged materials are in the trial record, and therefore are not properly before us, Green's motion to strike is granted.

ble crime against an innocent 4–year–old girl. The evidence presented at Green's trial indicates that Green had sexual contact with the alleged victim. I conclude that the evidence is more than sufficient to support the jury's verdict of guilty for second-degree criminal sexual conduct, and I would affirm that verdict. Rather, this case is about whether our court will remain mindful of one of our most solemn obligations—to ensure the basic fairness of the procedures used to deprive a citizen of his liberty.

Green was initially charged with one count of second-degree criminal sexual conduct in violation of Minn.Stat. § 609.343, subd. 1(a) (2006). On the morning of the first day of trial, however, the State amended the complaint to include an additional charge of first-degree criminal sexual conduct in violation of Minn.Stat. § 609.342, subd. 1(a) (2006). The difference between these two charges is that the first-degree offense requires "sexual penetration" whereas the second-degree offense requires "sexual contact." *Compare* Minn.Stat. § 609.342, subd. 1(a), *with* Minn.Stat. § 609.343, subd. 1(a). As relevant to the present proceedings, sexual contact includes "intentional touching by the actor of the complainant's intimate parts" that is "committed with sexual or aggressive intent." Minn.Stat. § 609.341, subd. 11(a)(i) (Supp.2007). Sexual penetration, on the other hand, includes an "intrusion however slight into the genital or anal openings" of the victim by a part of the actor's body. Minn.Stat. § 609.341, subd. 12(2)(i) (2006).

Both charges in this case were based on an allegation that Green sexually assaulted the alleged victim—a 4–year–old girl—while helping her change out of her swimsuit after swimming at a family picnic. The issue in this appeal centers on Green's interview with Deputy Nachreiner during the police investigation into this allegation. During this interview, Green admitted that he "open[ed] her up a little bit" but stated that he was just checking to "make sure she was clean." According to the transcript of this interview, which was prepared by the State, Green gave the following answer when asked where exactly he put his two fingers:

> Well I, oh I don't know, I suppose *in*, I can't remember if it was this way or that way, but she was on, she was on the couch and probably this way and just I checked to make sure there wasn't anything you know by the top part.

(Emphasis added.) The transcript, in this form, was admitted into evidence, the relevant parts were read to the jury, and it was taken into the jury room. But on appeal the State concedes that the transcript was incorrect and that the tape of the interview reveals that Green actually said, "I suppose *uh* " or "I suppose *um*," not "I suppose *in*." Thus, the State's mistranscription of this one sound had the effect of changing a meaningless utterance by Green into a confession of the critical element distinguishing first- and second-degree criminal sexual conduct—sexual penetration.

The majority suggests that Green's conviction for first-degree criminal sexual conduct is not fundamentally unfair because "the strength of the [other] evidence presented against Green" rendered the error insignificant. But outside of the meaningless utterance that the State turned into a confession, the evidence at Green's trial consisted only of statements made by Green that he had "opened [the alleged victim] up a little bit" and "cleaned her out," and a statement by the alleged victim to her mother that Green had touched her in the genital area. While an admission to "clean[ing] her out" could be interpreted to include penetration, the meaning of this

phrase in the context of this case is not entirely clear. Thus, although the other evidence certainly suggests contact with the alleged victim's intimate parts, the only unequivocal evidence presented to the jury that Green had penetrated the alleged victim was the inaccurate statement from the transcript of Green's interview with Deputy Nachreiner.

The effect of the transcription error in this case was amplified by the State's repeated emphasis on the inaccurate statement. While cross-examining Green, the State highlighted the erroneous confession by reading Deputy Nachreiner's question and instructing Green to recite his response from the transcript "[w]ord for word." Moreover, the State repeatedly highlighted the inaccurate confession during the State's closing argument. At one point, the State described the erroneous confession as "the most telling evidence of penetration" and read Green's purported answer to the jury. The State also suggested that the jury "ought to take [Green] at his word when he was asked where his fingers went, and he said, 'I suppose they went in.'" Finally, during rebuttal argument, the State responded to the defense's argument that the evidence of penetration was unclear by stating:

> When you go back in the jury room, I want you to read that question because the question is, "Where did your fingers go? Where exactly did your fingers go?". And that's what he responds to. "Oh, I don't know, I suppose in." And I don't think that's murky, or ambiguous, or anything else. I think it is clear.

Under these circumstances, where the erroneous confession is the only unequivocal

evidence of penetration and this error was repeatedly emphasized by the State, I cannot agree with the majority's conclusion that the erroneous confession "likely had no significant impact on the jury's verdict." [1]

Even more troubling is the majority's assertion that, despite the uncontradicted fact that the State *created* the transcript of the interview and was therefore the party that turned a meaningless noise into a confession, "Green bears the greater responsibility for his inaccurately transcribed statement being put in front of the jury." The majority first attempts to support this conclusion based on the fact that Green's attorney introduced the erroneous transcript into evidence. While this fact is undisputedly true, the record shows that the State had notified Green's attorney before trial that it possessed "[c]onfessions, admissions, or statements in the nature of confessions made by the defendant," and the erroneous transcript of Green's police interview was included with that disclosure. Once Green decided to testify in his own defense, it was reasonable for Green's attorney to anticipate that the State would confront Green with the transcript on the witness stand. Indeed, as the trial played out, the State did in fact confront Green with the erroneous transcript during cross examination. Thus, the fact that Green's attorney made the strategic decision to defensively introduce the transcript into evidence before his client was confronted with it on the witness stand does not appear sufficient to shift the responsibility for the error away from the State, which actually made the error.

---

1. My conclusion that the erroneous confession cannot be said to be harmless in this case does not mean that the evidence against Green, including Green's actual statements during his police interview, would not be sufficient to sustain a guilty verdict for first-degree criminal sexual conduct if the evidence were presented to a jury without the inaccurate confession presented in this case.

The majority also attempts to shift the blame to Green by focusing on the fact that Green's attorney did not listen to the recording of the interview before introducing the transcript into evidence. But in preparing to present the State's case, the prosecuting attorney either: (1) also failed to listen to the recording; (2) listened to the recording but failed to discover the transcription error; or (3) discovered the error but failed to correct it. Because the State thus had at least as much of an opportunity to discover and correct the transcription error as Green's attorney, and because the State has the burden of proving each element of a criminal offense beyond a reasonable doubt, I believe that it is unfair to hold Green's attorney to a higher standard in this regard by shifting the responsibility for the error away from the State and onto Green.

Finally, the majority attempts to support its conclusion that Green bears the greater responsibility for the introduction of the erroneous confession by noting that Green failed to challenge the accuracy of the transcript on cross-examination. While on the witness stand, the State confronted Green with a document that it asserted was an accurate transcript of an interview that Green had given months before. This confrontation occurred during a cross-examination in a trial where Green was facing the possibility of a substantial prison sentence. In these highly stressful circumstances, Green did not directly challenge the authenticity of the transcript. Nevertheless, he did continue to challenge the truth of the allegation that he had penetrated the alleged victim. Yet the majority concludes that Green bears more responsibility for the error because he did not discover and challenge the transcription error *made by the State.* This conclusion ignores the realities faced by an individual in such circumstances and un-

fairly shifts the responsibility for the error away from the party that actually made it.

Minnesota Rule of Criminal Procedure 26.04, subd. 1, allows a new trial "[i]f required in the interests of justice." In this case, Green was charged with both first- and second-degree criminal sexual conduct. The evidence presented at Green's trial indicates that Green committed a terrible crime—second-degree criminal sexual conduct—by engaging in sexual contact with a 4–year–old girl, and I agree that Green should be punished for that offense. But the only unequivocal evidence of penetration presented to the jury in this case was the inaccurate transcript of Green's police interview that was prepared by the State, admitted into evidence, and repeatedly emphasized by the State. Thus, with respect to the higher first-degree charge, it is hard to imagine many stronger cases for a new trial "in the interests of justice" than a conviction based on the State's transcription error that changed a meaningless utterance into a confession of the defining element of that crime. If in a case like this we ignore our solemn obligation to ensure the fairness of judicial proceedings and refuse to step in to see that justice is done, who is left to perform this duty? Accordingly, I would reverse Green's conviction for first-degree criminal sexual conduct and remand this case to the district court for further proceedings on that charge or, alternatively, for conviction and sentencing on the second-degree criminal sexual conduct charge.

MEYER, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.