**STATE of Minnesota, Appellant,**

v.

**Alan George OLHAUSEN,
Jr., Respondent.**

**No. C1–02–1361.**

Supreme Court of Minnesota.

June 10, 2004.

John B. Galus, Assistant Attorney General, St. Paul, MN, L. Douglas Storey, Cottonwood County Attorney, David Paul Honan, Cottonwood County Attorney, Windom, MN, for Appellant.

Daniel S. Adkins, Richard Sand & Associates, St. Paul, MN, for Respondent.

## OPINION

GILBERT, Justice.

This case involves a first-degree controlled substance conviction where the defendant prevented scientific testing of the alleged substance by disposing of it while fleeing the crime scene. Respondent was convicted of three counts of a first-degree controlled substance crime: aiding and abetting the sale of 10 or more grams of a mixture containing methamphetamine in violation of Minn.Stat. §§ 152.021, subds. 1(1) and 3, and 609.05 (2000); conspiracy to sell 10 or more grams of a mixture

containing methamphetamine in violation of Minn.Stat. §§ 152.021, subds. 1 and 3, and 152.096 (2000); possession of 25 or more grams of a mixture containing methamphetamine in violation of Minn.Stat. § 152.021, subds. 2(1) and 3 (2000). Respondent was also convicted of fleeing a peace officer in a motor vehicle in violation of Minn. Stat § 609.487, subd. 3 (2000) and one count of first-degree criminal damage to property in violation of Minn.Stat. § 609.595, subds. 1(1) and 1(3) (2000). The court of appeals reversed each first-degree controlled substance conviction, reasoning that a scientific test of the actual alleged drug substance was necessary for conviction. *State v. Olhausen,* 669 N.W.2d 385, 393 (Minn.App.2003). We reverse.

On December 12, 2000, an investigator with the Worthington Police Department received information that respondent Alan George Olhausen, Jr., would be willing to sell 2 pounds of methamphetamine. This information was passed along to Robert Nance, a special agent with the Minnesota Bureau of Criminal Apprehension. Nance began to pursue an undercover drug deal with respondent. Nance placed a series of tape-recorded telephone calls to respondent on December 12 and 13 in order to set up a purchase of methamphetamine. In one conversation, on December 13, 2000, respondent told Nance that, "I got two right now," which Nance understood to mean 2 pounds of methamphetamine. Nance agreed to purchase half that amount.

Respondent told Nance that he had to retrieve the purchase item from a friend, May Chantharath, who was located at a Toro plant in Windom. Nance set up a meeting with respondent that evening at a gas station in Worthington. Nance was equipped with an electronic listening device and brought a roll of money that resembled $10,000. After meeting at the gas station, Nance drove behind respondent to the Toro plant parking lot. At the parking lot, Nance got into respondent's car, and respondent utilized Nance's cell phone to attempt to contact Chantharath. Nance overheard respondent state, "Hey, man, I am outside your work. Swing out when you can. Talk to you then." Following the call, respondent produced a clear plastic bag containing a yellow, chunky substance, perhaps as a sample, and stated "this is what it is, right here." Nance never actually took possession of the plastic bag, but believed that it contained approximately 3.5 grams of methamphetamine. Nance told respondent that he would not give him the money until he saw the methamphetamine.

Respondent again attempted to contact Chantharath by calling the Toro Corporation. Nance heard respondent state "Is there any way I could talk to May Chantharath?" Respondent then went on to advise the party to have Chantharath call him back. At that point, Nance returned to his car, drove behind respondent to another area of the parking lot and parked next to respondent. Chantharath called Nance's cell phone and requested to speak with respondent. Nance reached through his car window and handed the cell phone to respondent. Nance overheard respondent tell Chantharath, "Hello. Hey I am here. I got the money for one. And the other guy will be here later." Nance later heard respondent state, "Ten for one," followed by "You are in your car?" and "He wants to look at it." Nance understood respondent's "ten for one" comment to mean $10,000 for 1 pound of methamphetamine. Respondent then commented that he hoped that the methamphetamine was properly packaged into one pound.

Nance then received a call from a special agent who was covertly monitoring the situation. The special agent advised

Nance that Chantharath had exited the Toro plant and was walking to Chantharath's car. Respondent then drove to Chantharath's car. Nance never saw respondent actually enter Chantharath's car because his view was blocked by respondent's car. Several minutes later respondent returned to Nance's car and indicated that he had the 1–pound package with him. Respondent noted that the Toro parking lot might have cameras that could record the transaction, and in response Nance suggested that they go to the nearby Hy–Vee parking lot which was located approximately an eighth of a mile from the Toro parking lot. Nance also believed the Hy–Vee parking lot was a location that would be suitable for arresting respondent. Nance and respondent drove separately to the Hy–Vee parking lot.

Once they arrived at the Hy–Vee parking lot, Nance entered respondent's car and questioned him about the packaging of the alleged methamphetamine. Respondent then ripped open a corner of the package and stated, "See, it is covered in cinnamon and mustard." Nance testified that the package appeared to be heat-sealed and he estimated that it measured approximately 10 inches by 16 inches. Inside the package was a hard, dark-colored cylinder or "sausage-shaped" object that was about 8 inches in length by 3 to 4 inches in diameter. Nance testified he handled the package and that it had an oily texture. Nance noted that he smelled cinnamon and that the usual purpose of a cinnamon coating is to mask the scent of the methamphetamine from drug detection dogs. Nance also noted that methamphetamine may be in a cylinder shape because it is commonly smuggled in pipes to further avoid detection. Nance noted that methamphetamine has a very distinctive odor and that the first thing he does while working undercover is "to take a smell of it." Nance admitted, however, that he could not recognize the distinct methamphetamine smell on the substance that respondent presented to him. Nance testified that he had done three to four hundred undercover drug buys and had seen methamphetamine many times before. Nance thoroughly believed that the substance shown to him was methamphetamine; however, he also testified that he could not say that the packaged substance was methamphetamine with "100%" certainty. Nance further testified that he has only purchased one "turkey" buy, or a fake substance that was masked to look like drugs. To Nance's estimate, the package weighed 1 pound or approximately 453 grams. Respondent's counsel did not object to Nance's testimony regarding his descriptions of the alleged methamphetamine that respondent was attempting to sell.

After looking at the package, Nance signaled to the surveillance officers to move in and arrest respondent. Before the officers could do so, Nance exited the vehicle, indicating to respondent that he was going to retrieve the money to complete the purchase. As the surveillance officers approached respondent's car in unmarked squad cars, respondent accelerated his car forward, damaged a police car, and drove off. Several officers chased after respondent, but he managed to escape.

Respondent was arrested for an unrelated offense on December 22, 2000. After his arrest, respondent agreed to speak with law enforcement officials. Respondent said that he threw the alleged drugs out the window of his car during his escape from the scene. The alleged drug substance was never found. On December 31, 2000, in an apparent attempt to obtain leniency, respondent contacted the police and stated that he would show them where he discarded the alleged drugs. Respondent showed the police the location, but

officers could not locate anything on two separate occasions.

Respondent's friend, Chantharath, was arrested at the scene. Respondent was arrested 9 days later. Nance interviewed respondent, who admitted that the substance he tried to sell Nance was methamphetamine he obtained from Chantharath. When Chantharath was arrested, no methamphetamine was found in his possession. He told the police that he had provided respondent with a pound of methamphetamine to sell. Chantharath never testified at respondent's trial. Respondent's counsel objected to Nance's testimony about Chantharath's statement; however, the district court allowed it on re-direct because respondent's counsel first entered into this line of testimony on cross-examination.

At the omnibus hearing on June 11, 2001, respondent moved the district court for an order dismissing the charges for lack of probable cause because the alleged methamphetamine was not actually in evidence, had not been scientifically tested or weighed, and no money had actually exchanged hands in the transaction. In denying respondent's motion, the district court noted that there is "sufficient evidence that a rational fact finder could find the essential elements of a controlled substance and its one-pound weight notwithstanding the fact that the drug was never recovered." On February 20 and 21, 2002, a jury trial was held. Respondent never testified at trial. At the close of trial, respondent's counsel brought a motion for judgment of acquittal, arguing that the state failed to show that a drug substance existed and also failed to show the weight of the substance.[1] The motion was denied,

and the matter was submitted to the jury. The jury found respondent guilty of all counts. Respondent was sentenced on the first-degree possession count and for fleeing a peace officer.

On appeal, the court of appeals, in a 2–1 decision, reversed each of the first-degree counts and remanded the case to the district court. *Olhausen*, 669 N.W.2d at 393. The court of appeals upheld the conviction for fleeing a peace officer in a motor vehicle and criminal damage to property. Two members of the panel held that the evidence regarding the drug sale was insufficient because the alleged methamphetamine was never recovered and thus unable to be scientifically tested or weighed. *Id.* In his dissenting opinion, Judge Forsberg argued that the evidence was sufficient due to respondent's confession that was corroborated by his accomplice. *Id.* at 393–94. We reverse.

### I.

In considering a claim of insufficient evidence, the record is reviewed to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach their verdict. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). The standard for the sufficiency of the evidence to support a conviction is greater than probable cause. *See, e.g., State ex rel. Hastings v. Bailey*, 263 Minn. 261, 266, 116 N.W.2d 548, 551 (1962). We assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Steinbuch*, 514 N.W.2d 793, 799 (Minn. 1994); *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). We will not disturb the verdict if the jury, while acting with prop-

---

1. Both respondent's counsel and the court of appeals referred to this motion as a "motion for directed verdict." *Olhausen*, 669 N.W.2d at 389. However, motions for directed verdict have been abolished in criminal trials in Minnesota. The proper motion would be a motion for judgment of acquittal. *See* Minn. R.Crim. P. 26.03, subd. 17(1).

er regard for the presumption of innocence and regard for the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense. *State v. Pierson*, 530 N.W.2d 784, 787 (Minn.1995); *State v. Alton*, 432 N.W.2d 754, 756 (Minn. 1988).

Where direct evidence is not available, a conviction based on circumstantial evidence can be "entitled to the same weight as direct evidence." *State v. Bauer*, 598 N.W.2d 352, 370 (Minn.1999). When a defendant is convicted based on circumstantial evidence, "[t]he evidence is entitled to the same weight as any evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *State v. Bias*, 419 N.W.2d 480, 484 (Minn. 1988). A conviction may stand where the circumstances "form a complete chain which, in the light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980). This stricter standard, though, "still recognizes a jury is in the best position to evaluate the circumstantial evidence surrounding the crime * * *." *State v. Race*, 383 N.W.2d 656, 662 (Minn.1986). As in all cases, the jury determines the credibility and weight given to the testimony of individual witnesses. *State v. Daniels*, 361 N.W.2d 819, 826 (Minn.1985).

Minnesota Statutes § 152.021, subd. 1(1) (2002) provides that a person is guilty of a controlled substance *sale* crime in the first degree if "on one or more occasions within a 90–day period the person unlawfully sells one or more mixtures of a total weight of ten grams or more containing cocaine, heroin, or methamphet-

amine." A person is guilty of a controlled substance *possession* crime in the first degree if "the person unlawfully possesses one or more mixtures of a total weight of 25 grams or more containing cocaine, heroin, or methamphetamine." Minn.Stat. § 152.021, subd. 2(1) (2002). Where the identification of the drug is in question, we have not prescribed any minimum evidentiary requirements and the sufficiency of the evidence is examined on a case-by-case basis. *State v. Vail*, 274 N.W.2d 127, 134 (Minn.1979).

The state argues that, despite the fact that methamphetamine was never found, a combination of factors shows that respondent is guilty of controlled substance sale and possession crimes in the first degree. We agree. These factors include: (1) respondent's agreement to sell 1 pound of methamphetamine, (2) respondent's phone calls to arrange the sale, (3) respondent's representation of a small sample to Nance, a sample that Nance believed to be authentic methamphetamine, (4) respondent's various statements, including an offer to sell "ten for one," or 1 pound of methamphetamine for $10,000, (5) respondent's various indications that the package he obtained from Chantharath was 1 pound of methamphetamine, (6) Chantharath's representations to the police that he furnished respondent with 1 pound of methamphetamine, and (7) respondent's dramatic flight from the scene of the incident.

The court of appeals readily acknowledged that the factual circumstances indicate that respondent believed he was selling 1 pound of methamphetamine. *Olhausen*, 669 N.W.2d at 391. It further noted that there is a "strong inference" that respondent's " 'sausage-shaped' package in fact contained methamphetamine." *Id.* The court of appeals focused on the possibility that respondent could have been misled into thinking that the sub-

stance was genuine methamphetamine, noting "[respondent's] representations to Agent Nance are supported only by [respondent's] belief that the package contained methamphetamine." *Id.*

To support its line of reasoning, the court of appeals relied heavily on our opinion in *Vail. Id.* at 390–91 (citing *Vail* 274 N.W.2d at 127). There, a defendant was charged with selling 220 pounds of marijuana to an undercover officer. *Vail*, 274 N.W.2d at 133. The defendant obtained the alleged drug from a separate dealer and transported it to the undercover officer before being arrested. *Id.* To prove that the defendant was selling 220 pounds of marijuana, the state introduced scientific and circumstantial evidence. *Id.* at 130. We affirmed the district court's finding that the scientific tests were insufficient to identify the substance beyond a reasonable doubt, noting that "[w]hether this court would draw the same conclusion from the evidence is not relevant; our role as a reviewing court is limited. The trial * * * was held following defendant's written and informed waiver of his right to a jury. Under those circumstances, the judge's findings of fact are entitled to the same weight on review as a jury verdict." *Id.* at 133.

However, the district court considered "inferences identifying the substance from the nonscientific evidence." *Id.* This included:

1. The amount of the [agreed] sale amounting to 220 pounds.
2. The sale price amounting to $120 per pound.
3. The statement of the Defendant * * * quoted by the State's witness * * * identifying the product as not only marijuana, but identifying the product as 'Mexican grade' marijuana.
4. The inferred fact * * * that a seller of a product containing 220 pounds is probably sophisticated and competent and alert enough to have made his own tests before he himself bought the product for presumably a considerable sum of money from his supplier. Whether that task was simply smoking the product in order to test the substance or whether the product was otherwise analyzed is, of course, unknown to the court. *Id.* at 133–34.

We held that, given the facts of that matter, the nonscientific evidence was impermissibly used to sustain the state's burden of proof. *Id.* at 134. We held so in part because "[t]he price charged and representations made by the defendant are, at best, only assertions of his belief." *Id.* The defendant's own personal belief of and representations of the substance as a controlled substance was "not sufficient" to prove identity. *Id.* (citing to *State v. Dick,* 253 N.W.2d 277, 278–79 (Minn.1977) (finding that a scientific microscopic analysis by an official criminalist was sufficient to identify marijuana)).

The court of appeals also relied on our opinion in *State v. Robinson. Olhausen,* 669 N.W.2d at 393 (citing *State v. Robinson,* 517 N.W.2d 336 (Minn.1994)). There, a defendant was found in possession of 13 packets of what appeared to be cocaine. *Id.* at 337–38. Together the 13 packets weighed 16.7 grams. *Id.* at 338. The state's expert randomly tested 6 or 7 of the 13 packets by emptying them together into a container and testing samples of the resulting mixture. *Id.* We held that the random sampling and testing of less than 10 grams of the substance was insufficient to prove that the cocaine weighed more than 10 grams. *Id.* at 339. Determining weight by a random sample of separately packaged cocaine "does not take into account the fact that, in the case of substances not homogeneously packaged, drug dealers are known to substitute placebos

for the real thing. Indeed, substitution is apparently common enough that it has achieved a criminal status of its own." *Id.* (pointing to Minn.Stat. § 152.097 (2002) (simulated controlled substance crimes)). We emphasized that "[w]here a penalty as serious as 10 years' imprisonment may hinge on a gram, it seems not too much to require scientific testing to establish the requisite weight." *Id.* at 340.

■■■ The facts currently presented before us differ from the scenarios in *Vail* and *Robinson.* In both *Vail* and *Robinson,* the state had possession of the entire amount of controlled substance at issue but failed to use adequate procedures to scientifically test this substance.[2] Here, respondent discarded the alleged controlled substance, thereby preventing the state from performing scientific tests. It was respondent, not the state, who prevented more thorough testing. Furthermore, in *Vail,* even though the state had possession of the alleged controlled substance, we were faced with the finding from the district court that the scientific evidence presented was inadequate to prove beyond a reasonable doubt the identity of the controlled substance. *Vail,* 274 N.W.2d at 133. Here, we are presented with a jury conviction, and must apply a standard that recognizes that the jury is in the best position to evaluate evidence surrounding the crime. *Race,* 383 N.W.2d at 662.

The circumstantial evidence surrounding respondent's attempted sale and possession of a controlled substance is compelling. Despite the fact that respondent disposed of the alleged controlled substance, circumstantial evidence included numerous statements of respondent and his coconspirator about the contents and weight of the package. The package itself was visible to Nance who, through his experience, identified it as genuine methamphetamine. The officer rendered his opinion, without objection from respondent's counsel, as to the alleged drug's authenticity, size, weight, and dollar amount for the cost of a similar substance.

The court of appeals was correct in its assertion that it is difficult to decipher an absolute accurate weight of the substance in the present matter, as it is unknown how much of the substance was pure methamphetamine or how much of the package weight was attributable to the cinnamon or other substances that Nance smelled. However, Nance testified that he estimated that the package that he saw and held weighed approximately 1 pound, or 453 grams. The state only needed to prove the existence of 10 grams (or approximately 2.2% of the total estimated package weight) in order to satisfy the requirement of a first-degree sale offense per Minn. Stat. § 152.021, subd. 1(1). Similarly, for the first-degree possession offense, the state had to prove the portion in possession weighed at least 25 grams (or approximately 5.5% of 1 pound) to qualify for a first-degree possession offense per Minn. Stat. § 152.021, subd. 2(1). There was a leeway of 443 grams for the first-degree sale and 428 grams for the first-degree possession count. The margin of error, if there was an error, was great. Although the substance was not scientifically tested, circumstantial evidence and officer testimony may be presented to the jury to

---

2. In *Vail,* the district found the state's scientific testing to be insufficient. *Vail,* 274 N.W.2d at 133. We upheld the district court's finding. *Id.* In *Robinson,* the court of appeals held the state's random drug testing of a partial amount of the evidence to be sufficient. *Robinson,* 517 N.W.2d at 339. We reversed the court of appeals decision and held that the random sampling and testing was insufficient. *Id.* at 340.

attempt to prove the identity of the substance.

Furthermore, it is uncontested that respondent fled the scene of the alleged crime. We have held that evidence of flight "suggests consciousness of guilt." *State v. Bias,* 419 N.W.2d 480, 485 (Minn. 1988). The court of appeals acknowledged respondent's consciousness of guilt, but instead heavily cited to our opinion in *Robinson,* which held circumstantial evidence inadmissible because there was "no good reason why a sufficient quantity of the mixture should not be scientifically tested so as to establish beyond a reasonable doubt an essential element of the crime charged." *Olhausen,* 669 N.W.2d at 393 (citing *Robinson,* 517 N.W.2d at 339). Unlike the situation in *Robinson,* where drugs held by the police were not properly tested, in the present matter there is a good reason that the alleged drugs could not be tested; namely, that respondent admittedly disposed of the package when he fled the police to avoid confiscation of the package.

The record in *Robinson* also contained evidence that the defendant in that case had a history of attempting to sell a placebo in place of a controlled substance. *Id.* at 338. In contrast to *Robinson,* there is nothing in the present record supporting an inference that the package produced was anything other than what it was represented to be. Prior to or during the sale, there were no indications by any parties involved that the drugs might be a placebo. Nance, for example, testified that in his vast experience with undercover methamphetamine purchases, it is extremely rare for a placebo to be sold in place of methamphetamine. He further testified that his significant training would alert him to recognize genuine or fake drugs and he believed that respondent was selling genuine methamphetamine.

Nance, respondent, and his coconspirator all consistently indicated that the package respondent designated as methamphetamine was genuine. In addition, when respondent was attempting to sell the substance to Nance, respondent went to great lengths to substantiate his ability to sell genuine methamphetamine. These efforts included multiple phone calls, respondent's representation of a small sample, and respondent's various statements, including an offer to sell "ten for one," or 1 pound of methamphetamine for $10,000. Nance's testimony is consistent with the various other pieces of evidence pointing towards the genuine nature of the substance that respondent was attempting to sell.

A conviction based on circumstantial evidence may stand where the evidence forms "a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *Wahlberg,* 296 N.W.2d at 411. This standard "still recognizes a jury is in the best position to evaluate the circumstantial evidence surrounding the crime * * *." *Race,* 383 N.W.2d at 662. As we previously stated, where the identification of the drug is in question, the sufficiency of the evidence is examined on a case-by-case basis. *Vail,* 274 N.W.2d at 134. Accordingly, we hold that the evidence presented, when viewed in the light most favorable to the conviction, is sufficient to uphold the jury verdict relating to respondent's first-degree controlled substance offenses.

Reversed.