CHUTICH, Justice.
*643 In this case we consider what it means to "leave[ ] a primary address" under Minnesota's predatory-offender registration statute, which makes an offender's knowing failure to register a felony offense. Minn. Stat. § 243.166, subds. 3a(a), 5(a) (2018). A jury found appellant Jose Alarcon, Jr. ("Alarcon") guilty of knowingly failing to register as a predatory offender when he did not register with local law enforcement authorities within 24 hours of leaving his registered primary address, a motel room in Albert Lea.
Alarcon appealed, and the court of appeals affirmed, concluding that sufficient evidence sustained his conviction. We hold that to convict a defendant of knowingly failing to register when a predatory offender "leaves a primary address and does not have a new primary address," Minn. Stat. § 243.166, subd. 3a(a) (2018), the State must prove not only that the defendant's living arrangement at the primary address had ended, but also that the defendant knew that this living arrangement had ended. We further hold that the evidence at trial was insufficient to support Alarcon's conviction. The State attempted to prove by circumstantial evidence that Alarcon knew that his living arrangement at the motel had ended. The circumstances proved, however, were consistent with a reasonable inference to the contrary. We therefore reverse the decision of the court of appeals.
FACTS
Respondent the State of Minnesota charged Alarcon with knowingly failing to register as a predatory offender under Minnesota Statutes section 243.166, subdivision 5(a). The probable cause portion of the criminal complaint alleged that Alarcon "did not report to the arresting officer, his probation officer, or other law enforcement officer his change of primary address despite the statutory requirement to do so within 24 hours of the loss of primary address on April 3rd, [2015]." At a jury trial, the following evidence was presented.
Alarcon was required to comply with the predatory-offender registration requirements because in August 2014, he was convicted of soliciting a child to engage in sexual conduct. See Minn. Stat. § 243.166, subd. 1b(a)(2) (2018). Upon his conviction, Alarcon signed a "duty to register" form. On the form, Alarcon acknowledged that "if I do not have a primary address I must report to the law enforcement authority with jurisdiction in the area where I will be staying within 24 hours of leaving my former primary address."
About 4 months later, on December 15, 2014, Alarcon moved to a motel in Albert Lea. He registered the motel's address as his "primary address." Two weeks later, he updated his information to specify the room number in which he was living, and he signed another "duty to register" form. Alarcon's living arrangement with the motel was not governed by a written lease agreement. Rather, he orally agreed to pay the motel in advance for his stay-first, on a monthly basis, but then on a weekly basis and sometimes on a daily basis. At the time of the alleged offense, Alarcon was paying in advance on a weekly basis.
Alarcon paid his rent using a credit card from a relative for nearly 4 months without incident. But on April 3, 2015, when *644 the motel attempted to charge Alarcon for the upcoming week, the credit charge was declined. Alarcon was not at the motel that day but his personal belongings were in his room, unpacked. Because of the declined charge, the motel manager placed a "boot" on the doorknob that prevented Alarcon from re-entering the room and a note on the door about the lapsed payment. According to the manager's trial testimony, the note read, "Mr. Alarcon, your rental [sic] is due today at 11 a.m. It was not paid due to a declined credit card. We have secured your room, and to gain access to the room and your property, payment must be made." The manager did not have any other contact information for Alarcon, so was unable to reach him. After waiting 24 hours, the manager instructed his staff to pack Alarcon's belongings and place them in storage so that the room could be rented to another customer.
Three days later, on April 6, 2015, Alarcon was arrested in Albert Lea during a traffic stop on unrelated charges. Apparently, the police discovered that Alarcon was a registered predatory offender upon his booking into jail. The next morning, the jail updated his registered primary address to reflect that he was "currently housed at the Freeborn County jail as of April 7, 2015."
Alarcon's probation officer testified that Alarcon did not notify her that he had left his primary address at the motel on April 3, 2015, did not discuss any plans to change his primary address, and did not contact her at all during the 3-day period between April 3 and April 6, 2015. The motel manager also testified that Alarcon did not contact him during that 3-day period. The manager testified that "at some point" after April 6, 2015, Alarcon called to arrange to pick up his belongings from the motel, estimating that Alarcon retrieved his belongings a couple weeks later.
A jury found Alarcon guilty of knowingly failing to register as a predatory offender. He was sentenced to 18 months in prison.[1] On appeal Alarcon challenged the sufficiency of the evidence at trial. The court of appeals affirmed Alarcon's conviction, concluding that the evidence was sufficient to show that he knew of his registration requirements and that he "had no arrangement to continue living [at the motel] once his payment was declined[.]" State v. Alarcon , No. A17-1325, 2018 WL 3520538, at *4 (Minn. App. July 23, 2018).
We granted Alarcon's petition for further review in part, agreeing to consider whether the State's evidence was sufficient to support his failure-to-register conviction.
ANALYSIS
Under Minnesota's predatory-offender registration statute, an offender must "register" with an assigned corrections officer or, in certain circumstances, a local law enforcement authority.[2] Minn. Stat. § 243.166, subd. 3(a) (2018). Registering requires the offender to provide, among other information, a "primary address."[3]
*645 Id. , subd. 4a(a)(1). A "primary address" is "the mailing address of a person's dwelling." Id. , subd. 1a(g). A "dwelling" is "the building where the person lives under a formal or informal agreement to do so." Id. , subd. 1a(c).[4]
The specific registration requirement at issue involves an offender who leaves a primary address. When an offender "leaves a primary address and does not have a new primary address," the offender must "register with the law enforcement authority that has jurisdiction in the area where the person is staying within 24 hours of the time the person no longer has a primary address." Id. , subd. 3a(a).
An offender who "knowingly violates any of [the] provisions" of the predatory-offender registration statute is guilty of a felony. Id. , subd. 5(a). The "knowingly" mens rea element requires the State to prove that the offender "know[s] that he is violating the statute when the violation occurs." State v. Mikulak , 903 N.W.2d 600, 603 (Minn. 2017).
Alarcon was convicted of knowingly violating Minnesota Statutes section 234.166, subdivision 3a(a), by failing to report, within 24 hours, that he left his primary address at the motel on April 3, 2015, without having a new primary address. He argues that the State did not prove that his duty to register was triggered because it failed to prove that he actually left his primary address at the motel or that he knew that his living arrangement was terminated by the motel for lack of payment. According to Alarcon, his conviction must be reversed because the State's evidence was circumstantial and open to reasonable inferences inconsistent with guilt. See State v. Al-Naseer , 788 N.W.2d 469, 473-74 (Minn. 2010) (setting forth the sufficiency-of-the-evidence standard of review when an element of a conviction is proven with circumstantial evidence).
When the sufficiency of the State's evidence is challenged on appeal, we ask whether the evidence, when viewed in the light most favorable to the conviction, was sufficient to permit a finder of fact to conclude that the defendant was guilty of the charged offense. State v. Olhausen , 681 N.W.2d 21, 25 (Minn. 2004). Alarcon's sufficiency-of-the-evidence claim turns on the meaning of the statute, however, which presents "a question of statutory interpretation that we review de novo." State v. Henderson , 907 N.W.2d 623, 625 (Minn. 2018). Accordingly, to determine if the State's circumstantial evidence was sufficient to support Alarcon's conviction, we must first determine what it means to "leave[ ] a primary address" under subdivision 3a(a).
I.
When interpreting the meaning of the phrase "leaves a primary address" in Minnesota Statutes section 243.166, subdivision 3a(a), we seek to "ascertain and effectuate" the Legislature's intent. Minn. Stat. § 645.16 (2018). If the Legislature's intent is clear from the statute's plain language, "then we interpret the statute according to its plain meaning without resorting to the canons of statutory construction." State v. Struzyk , 869 N.W.2d 280, 284-85 (Minn. 2015). The *646 threshold inquiry is therefore "whether the statute's language, on its face, is ambiguous." Christianson v. Henke , 831 N.W.2d 532, 536 (Minn. 2013) (citation omitted) (internal quotation marks omitted). If it is, we proceed to the second step and resort to the canons of statutory construction to resolve the ambiguity. State v. Thonesavanh , 904 N.W.2d 432, 435 (Minn. 2017).
A statute is ambiguous when it is "subject to more than one reasonable interpretation." State v. Fleck , 810 N.W.2d 303, 307 (Minn. 2012). In considering whether a statute is ambiguous, the "statute must be construed as a whole and the words and sentences therein 'are to be understood ... in light of their context.' " Schmidt ex rel. P.M.S. v. Coons , 818 N.W.2d 523, 527 (Minn. 2012) (quoting Christensen v. Hennepin Transp. Co. , 215 Minn. 394, 10 N.W.2d 406, 415 (1943) ). In the absence of statutory definitions, we may consider dictionary definitions to determine the meaning of a statutory term. See Shire v. Rosemount, Inc. , 875 N.W.2d 289, 292 (Minn. 2016). But the "relevant definition of a term depends on the context in which the term is used." State v. Nelson , 842 N.W.2d 433, 437 n.2 (Minn. 2014). If, after applying these principles, we conclude that the statute is not ambiguous, "our role is to enforce the language of the statute and not explore the spirit or purpose of the law," Christianson , 831 N.W.2d at 537.
As detailed above, the statute makes it a felony offense to "knowingly" fail to abide by the registration requirements. Minn. Stat. § 243.166, subd. 5(a). An offender must register "with the law enforcement authority that has jurisdiction in the area where the person is staying within 24 hours" if he "leaves a primary address and does not have a new primary address." Id. , subd. 3a(a).
The verb "leave" in the phrase "leaves a primary address" can be interpreted in more than one way that is consistent with the dictionary meaning of the word "leave." For example, "leave" can mean a temporary departure from a place. See The American Heritage Dictionary 1000 (5th ed. 2011) (defining "leave" as "to go out of or away from"); Leave , Black's Law Dictionary (10th ed. 2014) (defining "leave" as "[t]o depart; voluntarily go away; quit (a place)"). One might leave home for 5 minutes to speak to a neighbor, or for an hour to get groceries, or for a week to go on vacation.
"Leave" can also denote a more indefinite or permanent departure, however. See The American Heritage Dictionary , supra at 1001 (defining "leave" as "to abandon or forsake: leave home "); Leave , Black's Law Dictionary , supra (defining "leave" as "[t]o depart willfully with the intent not to return"). Examples of "leaving" in this sense include an employee who leaves her job for a new opportunity or an immigrant who leaves her home country with no expectation that she will see it again. Obviously, someone who leaves her house to get groceries did not leave her home in the same sense that the immigrant has left her home. Consequently, we must look beyond the dictionary to ascertain what the Legislature meant by the phrase "leaves a primary address."
Other provisions in section 243.166 provide an answer. First and foremost, the phrase "leaves a primary address" in subdivision 3a(a) is immediately followed by the qualifying phrase "and does not have a new primary address. " Minn. Stat. § 243.166, subd. 3a(a) (emphasis added). The statute provides that when an offender "does not have a new primary address," the offender must register "within 24 hours of the time the person no longer has a primary address. " Id. (emphasis added).
*647 This language suggests that the Legislature intended the word "leaves" to mean more than a temporary departure. The phrase "a new primary address" implies the existence of a former primary address that no longer applies. Moreover, an offender who has a primary address, but leaves it temporarily, cannot be said to "no longer ha[ve] a primary address" if that address remains the place where the offender "lives under a formal or informal agreement." Id. , subd. 1a(c) (defining dwelling); see also id. , subd. 1a(g) (" 'Primary address' means the mailing address of the [offender's] dwelling."). Stated differently, for an offender to leave a primary address and no longer have a primary address, the circumstances of his departure must show that his living arrangement at the address has ended.
Second, the statute's distinction between a "primary address" and a "secondary address" confirms our understanding that only a definitive change in an offender's primary living arrangement triggers the duty to register. In contrast to an offender's "primary address," a "secondary address" is "the mailing address of any place where the [offender] regularly or occasionally stays overnight when not staying at a person's primary address." Id. , subd. 1a(i). Like primary addresses, secondary addresses must also be reported when an offender registers. Id. , subd. 4a(a)(2).
By placing secondary addresses within the ambit of the statute, the Legislature understood that an offender, like any other person, will occasionally spend time elsewhere and that doing so does not vitiate the primary living arrangement. If we presume, as we must, that the Legislature intended an offender's secondary address to be different than his primary address, we cannot conclude that the offender "leaves" his primary address, and triggers the registration requirements, every time that he leaves the primary address temporarily. See Allan v. R.D. Offutt Co. , 869 N.W.2d 31, 33 (Minn. 2015) (stating that statutes must be interpreted so that "no word, phrase, or sentence [is] superfluous, void, or insignificant"). To conclude otherwise would transform any secondary address into the offender's primary address, even if he only stays at the secondary address "regularly or occasionally." Minn. Stat. § 243.166, subd. 1a(i). Moreover, an offender would never need to report a secondary address because a temporary departure would trigger the requirement to re-register "with the law enforcement authority that has jurisdiction in the area where the person is staying." Minn. Stat. § 243.166, subd. 3a(a).
Taking subdivision 3a(a) in the context of section 243.166 as a whole, we conclude that an offender's registration requirement under subdivision 3a(a) is not triggered by every departure from the primary address. Instead, we hold that "leaves a primary address" plainly and unambiguously means that an offender's living arrangement at the primary address has come to an end.
II.
With the statutory term defined, we next consider Alarcon's claim that the State failed to present sufficient evidence to sustain his conviction. The felony offense of failing to register requires that the offender "know that he is violating the statute when the violation occurs." Mikulak , 903 N.W.2d at 603 (interpreting Minn. Stat. § 243.166, subd. 5(a) ). "[T]he knowledge and the violation must occur at the same time." Id. For an offender to know that he is violating the statute, the offender must know about the event that triggers the duty to register. Id. In this case, the State was required to prove that Alarcon knew that he had left his primary *648 address at the motel because he knew that his living arrangement there had ended.
When the sufficiency of the evidence to support a criminal conviction is challenged on appeal, we review the record "to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach their verdict." Olhausen , 681 N.W.2d at 25. The verdict must be affirmed if the jury, "acting with proper regard for the presumption of innocence and regard for the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense." Id. at 25-26.
Here, the State attempted to prove by circumstantial evidence that Alarcon knew that his living arrangement at the motel had ended. Circumstantial evidence review involves two steps. First, we must "identify the circumstances proved." Al-Naseer , 788 N.W.2d at 473. At this step, we " 'defer ... to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State.' " Id. (quoting State v. Andersen , 784 N.W.2d 320, 329 (Minn. 2010) ).
Second, we "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved." Id. at 473-74 (citation omitted) (internal quotation marks omitted). "We give no deference to the jury's choice between reasonable inferences at this second step." State v. Harris , 895 N.W.2d 592, 601 (Minn. 2017). Under this second step, "[t]o sustain the conviction, the circumstances proved, when viewed as a whole, must be consistent with a reasonable inference that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." Id. If, however, upon this independent examination, we conclude that "reasonable, rational inferences that are inconsistent with guilt" exist, the conviction must be reversed. Al-Naseer , 788 N.W.2d at 474 (citation omitted) (internal quotation marks omitted). "This is because if any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then a reasonable doubt as to guilt arises." Id. (citation omitted) (internal quotation marks omitted).
The State proved the following circumstances regarding Alarcon and his primary address. On December 15, 2014, Alarcon moved to a motel in Albert Lea. He registered the motel's address as his "primary address." Two weeks later, he updated his information to state the number of the room in which he was living, and he signed another "duty to register" form. Alarcon had an oral agreement to pay in advance for his stay at the motel. He paid his rent using a relative's credit card for nearly 4 months without incident. On April 3, 2015, Alarcon was paying the motel in advance for a 1-week stay. When the motel attempted to charge Alarcon on that date for the upcoming week, however, the credit charge was declined. Alarcon was not at the motel that day, but his personal belongings were in his room, unpacked. The motel manager placed a "boot" on the doorknob that prevented Alarcon from re-entering the room; he also left a note on the door about the declined payment. The manager did not have any contact with Alarcon that day. After waiting 24 hours, the manager instructed his staff to pack Alarcon's belongings and place them in storage so the room could be rented to another customer. On April 6, 2015, Alarcon was riding in L.H.'s car with L.H. and another friend when the car was stopped *649 by the police.[5] Alarcon was arrested during the traffic stop and brought to jail for charges unrelated to his failure to register. At some point after April 6, 2015, Alarcon called the motel manager to arrange to pick up his belongings, and Alarcon retrieved his belongings about 2 weeks later.
The circumstances proved, when viewed as a whole, allow a reasonable inference that Alarcon did not know that his living arrangement had been terminated during the 3-day period between April 3 and April 6, 2015. It is reasonable to infer that Alarcon was unaware of the declined charge given that he had been successfully using the credit card to make timely payments for 4 months. Alarcon was not in his room when the motel manager put the boot on the doorknob, and no evidence suggests that he saw the boot. Nor did any evidence suggest that Alarcon saw the note left by the motel manager on the door. That Alarcon's belongings were in the motel room, unpacked, when his payment was declined supports a conclusion that Alarcon did not intend for his stay at the motel to end and did not know that the payment had been declined.
According to the motel manager's testimony, the manager did not speak with Alarcon until sometime after April 6, 2015-at least two days after the motel staff removed Alarcon's belongings from the room. Consequently, the evidence leaves open the reasonable possibility that Alarcon had no knowledge that his living arrangement at the motel had ended until after his arrest on the evening of April 6, 2015. The circumstances proved by the State, therefore, do not eliminate the reasonable inference that Alarcon did not know that he was in violation of the registration statute when the violation occurred. As explained above, this inference is inconsistent with a finding of guilt. See Mikulak , 903 N.W.2d at 603 (concluding that "the defendant must know that he is violating the statute when the violation occurs").
The additional facts relied upon by the dissent concerning L.H. do not change our conclusion. The dissent argues that the inference that Alarcon did not know that his living arrangement ended is unreasonable because L.H. lived in the same motel as Alarcon, they "hung out almost every day," and Alarcon picked L.H. up at the motel on the day of the traffic stop.[6] These circumstances, however, do no more than support another reasonable version of events leading to Alarcon's arrest. They fail to provide the evidentiary weight that would make the inference that is inconsistent with guilt-that Alarcon did not know that his living arrangement had been terminated-unreasonable. If a reasonable inference inconsistent with guilt exists, then the circumstantial evidence is insufficient. Al-Naseer , 788 N.W.2d at 474. Because the circumstances proved, when viewed as a whole, are consistent with the reasonable *650 inference that Alarcon did not know that his living arrangement with the motel had ended, we hold that the State presented insufficient evidence to support Alarcon's conviction for knowingly failing to register within 24 hours.
CONCLUSION
For the foregoing reasons, we reverse the court of appeals and remand to the district court to vacate Alarcon's conviction for knowingly failing to register as a predatory offender.
Reversed.
Dissenting, McKeig, J.
DISSENT

Alarcon was also tried and convicted of unlawful possession of a firearm, Minn. Stat. § 624.713, subd. 1(2) (2018). The court of appeals affirmed this conviction, and we denied Alarcon's petition to review whether sufficient evidence supported it.

The term "offender" refers to any person who must comply with the registration requirements in the predatory-offender registration statute. See generally Minn. Stat. § 243.166, subd. 1b (2018) (describing persons who are required to register).

Offenders must also provide:
(2) all of the person's secondary addresses in Minnesota, including all addresses used for residential or recreational purposes; (3) the addresses of all Minnesota property owned, leased, or rented by the person; (4) the addresses of all locations where the person is employed; (5) the addresses of all schools where the person is enrolled; and (6) the year, model, make, license plate number, and color of all motor vehicles owned or regularly driven by the person.
Minn. Stat. § 243.166, subd. 4a(a)(2)-(6).

But, "[i]f the mailing address is different from the actual location of the dwelling, primary address also includes the physical location of the dwelling described with as much specificity as possible." Id. , subd. 1a(g).

L.H. testified at trial that she was currently Alarcon's girlfriend. She also testified, however, that back in April 2015, when the traffic stop occurred, she was not in a relationship with him. L.H. testified that she lived at the same motel as Alarcon, that they were friends, and that they had been spending time together "almost every day." According to a video of the traffic stop that the State presented at trial, L.H. told the police that Alarcon and the other friend had borrowed L.H.'s car on April 6, and had picked her up at the motel later that day. At trial, however, L.H. testified to a different sequence of events, stating that she, Alarcon, and the friend began their drive on April 6 at a third friend's house. Notably, during L.H.'s trial testimony, the State did not ask about Alarcon's whereabouts during the 3-day period at issue here or his knowledge concerning the status of his motel room.

As noted above, L.H.'s trial testimony contradicted this last assertion; she testified that she picked up Alarcon and his friend at a third friend's house, and not at the motel.