*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0263**

State of Minnesota,
Respondent,

vs.

Benton Louis Beyer,
Appellant.

**Filed January 29, 2024**
**Affirmed**
**Segal, Chief Judge**

Stearns County District Court
File No. 73-CR-21-5130

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Janelle P. Kendall, Stearns County Attorney, Ole Tvedten, Assistant County Attorney, St. Cloud, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Gaïtas, Presiding Judge; Segal, Chief Judge; and Cleary, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

NONPRECEDENTIAL OPINION

**SEGAL**, Chief Judge

In this direct appeal from the judgment of conviction for multiple offenses, including two counts of second-degree assault with a dangerous weapon, appellant argues that his statutorily enhanced sentences of 105 months in prison must be reduced to 84 months because the state failed to prove beyond a reasonable doubt that the second-degree assaults were committed "because of" another's race or color. We affirm.

## FACTS

In September 2022, a jury found appellant Benton Louis Beyer guilty of seven offenses, including two counts of second-degree assault. The jury also found the presence of several aggravating factors, including that the assaults were committed "because of" another's actual or perceived race or color. If a second-degree assault with a dangerous weapon is committed "because of" another's race or color, the statutory maximum sentence is increased by 25%, from 84 months in prison to 105 months. *See* Minn. Stat. §§ 609.222, subd. 1, .2233 (2020). The victims of Beyer's offenses were members of a family who had no relationship to Beyer except for Beyer's mistaken belief that Beyer's girlfriend, G.R., had "cheated" on him with an adult son of the family. The following is a summary of the facts established at trial.

The romantic relationship between Beyer and G.R. began in August 2020. A couple of months after their relationship began, G.R. "cheated" on Beyer with a biracial coworker who worked at the brewery where G.R. was then employed (the brewery coworker). G.R. eventually told Beyer about the infidelity, but it "took [her] awhile to tell him." She could

not recall exactly when she told Beyer, but believed it was in the spring of 2021.[1]  G.R. worked with the brewery coworker for a "[v]ery, very short time" before the individual quit and moved to California; she did not see him after he quit and never saw him when she was with Beyer.

Beyer was very upset about the infidelity and confronted G.R. about it on numerous occasions.  He frequently used racial slurs and racially charged language when referring to the individual and the infidelity.  For example, Beyer accused G.R. of having "jungle fever," being an "n[-word] lover," and going to an "n[-word] fam house."  Beyer also used racial slurs in posts on G.R.'s social-media accounts.  A neighbor of Beyer and G.R. testified at the trial that she could hear the couple fighting about the infidelity and that she heard Beyer yelling about "f-cking n[-word]s."  Additionally, Beyer sometimes became upset when he was with G.R. and they saw a Black male.

In April 2021, G.R. began a new job at a group home.  The family, who were the victims in this case, lived "approximately two houses" away from the group home.  The father, P.R., is Black and the mother, A.R., is White.  They have three younger children, and P.R. has an adult son who is Black and was living with the family at the time.  G.R. did not know any of the members of the family, including the adult son.  Her only connection to the family is that she was employed at a group home that happened to be located on the same block.  Based on statements made by Beyer, he apparently believed that P.R.'s adult son was the brewery coworker with whom G.R. had "cheated."

---

[1] Text messages confirm that Beyer was aware of the infidelity in early May 2021.

Beginning in May 2021, the family experienced incidents of vandalism outside their home. For example, in early May, someone shattered a window of one of the family's cars parked at their house. Approximately a week later, someone threw a rock through the sunroof of one of the family's other cars. The family installed security cameras after the first incident and reported both incidents to law enforcement. After the second incident, A.R. and P.R. reviewed footage from the security cameras. While reviewing the footage, they noticed two vehicles that they recognized as having driven by their house on multiple occasions. Through law enforcement's investigation into the vandalism, A.R. and P.R. learned that the vehicles belonged to Beyer and that his girlfriend worked at the nearby group home.

When P.R. observed one of Beyer's cars near the family's house on May 17, P.R. confronted Beyer, asked him why he kept driving by the house, and accused Beyer of damaging the family's cars. Beyer called 911 and reported that a "Black dude" had pulled out a knife and was threatening him and calling him names. When law enforcement arrived, Beyer told the officer that P.R. had a black and gray knife that was open and approximately eight inches in length. P.R. admitted that he had a small, orange pocketknife on his person during the confrontation, but denied showing it to Beyer. After the officer viewed video from the family's security camera of the interaction, the officer left and law enforcement took no further action. The following day, G.R. sent Beyer several text messages informing him that the police were at her workplace because they thought Beyer was there. Beyer was not there, but G.R. had driven one of Beyer's cars to work. Beyer responded, "That n[-word] called them."

A.R. subsequently obtained an ex parte harassment restraining order (HRO) against Beyer on behalf of herself and her minor children. The HRO prohibited Beyer from being within 1,000 feet of the family's house. In mid-June 2021, P.R. again observed Beyer drive by P.R.'s house. By that time, G.R. was no longer working at the group home. Law enforcement located Beyer driving near the residence and pulled him over; Beyer later called G.R. and suggested it was her fault that he got pulled over because it "ha[d] something to do with" her. On July 15, 2021, A.R. called law enforcement because she saw Beyer several times while she was shopping and believed that Beyer was violating the HRO. Law enforcement responded and arrested Beyer for violating the HRO. The following day, Beyer told his sister during a phone call that G.R. was cheating on him with the son of the woman who had a restraining order against him.

G.R. left Minnesota on July 17, 2021, and traveled to California without Beyer. Throughout July, Beyer continued to bring up G.R.'s infidelity and use racial slurs. Beyer sent G.R. two Facebook messages with one message saying: "You have no care for me whatsoever no love and you never did all you were was a n[-word] lover." The second message referred to G.R. as "[j]ungle fever" followed by expletives. In a Facebook message to one of G.R.'s friends, Beyer wrote that G.R. "has cheated on me many times and with some n[-word]." G.R. left Minnesota on July 17, 2021, and traveled to California without Beyer. Beyer thereafter sent G.R. numerous messages asking her when she would be back.

Throughout the evening of July 23 and the early morning of July 24, Beyer continued to send G.R. messages through various media platforms, telling her he loved her

5

and asking her to come back. He accused G.R. of leaving him and not wanting him, and informed her that "[i]t hurts." At approximately 2:00 in the morning, he sent a message that read, "I know what I'm thinking about doing." He sent a final message at approximately 4:50 a.m.

About 20 minutes later, Beyer left his apartment. He drove within a few blocks of a friend's house and parked. At 5:30 a.m., Beyer's friend called 911 to report that his Ford Excursion had just been stolen from his driveway. When asked if he knew who stole his car, he responded, "Benton Beyer I'm guessing. He had stole[n] my keys." Five minutes later, A.R. called 911 to report that someone had just crashed a Ford Excursion into her house. No one was injured, but one of the minor children had been sleeping on a couch only a few feet away from where the vehicle crashed into the house. Beyer fled the scene but was located and arrested later that day. Following his arrest, Beyer called G.R. several times from jail. During one of these phone calls, Beyer referred to A.R. as the mother of the individual with whom G.R. cheated on him, and stated he was "pretty sure [G.R.] kn[e]w her."

Respondent State of Minnesota charged Beyer with 11 offenses: two counts of stalking, three counts of damage to property,[2] three counts of violation of an HRO, theft, and two counts of second-degree assault. The state also filed a notice of its intent to seek an aggravated sentence on the second-degree-assault offenses because the offenses

---

[2] Two of these charges were premised on the allegation that Beyer was the individual who damaged the family's cars in May 2021. The other charge was based on damage to the residence resulting from the crash.

occurred in the presence of a child, in an area where the victim had an expectation of privacy, and were committed "because of" another's race or color.

A jury found Beyer guilty of seven offenses, including the two counts of second-degree assault. The jury acquitted Beyer of the two damage-to-property charges relating to the family's cars, one count of stalking, and the HRO-violation charge relating to the July 15 shopping incident. Regarding the aggravated-sentencing factors, the jury found that the state had proven beyond a reasonable doubt that the two assault offenses occurred in the presence of a child, in an area where the victims had an expectation of privacy, and were committed "because of" another's race or color. The district court sentenced Beyer to the enhanced maximum sentence of 105 months for each of the assault convictions and to 21 months in prison for theft of the friend's car, and ordered that the three sentences be served concurrently.

## DECISION

Beyer argues that his sentences for second-degree assault must be reduced from 105 months in prison to 84 months because the evidence is insufficient to establish that he committed the assaults "because of" another's race or color. He contends that, even if the circumstances proved support a rational hypothesis that he committed the assaults "because of" another's race or color, the evidence equally supports the alternate rational hypotheses that he committed the assaults because of jealousy or in retaliation for the HRO, not the family's race or color. He maintains that the enhanced sentence was thus erroneous and his sentence must be reduced.

We review the sufficiency of the evidence for jury determinations on sentencing issues in the same manner that we review the sufficiency of the evidence to support a conviction. *See State v. Gundy*, 915 N.W.2d 757, 767 (Minn. App. 2018), *rev. denied* (Minn. Aug. 7, 2018). When assessing a claim of insufficient evidence, appellate courts review the record to determine "whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow the jurors to reach their verdict." *State v. Olhausen*, 681 N.W.2d 21, 25 (Minn. 2004). We

> assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary. We will not disturb the verdict if the jury, while acting with proper regard for the presumption of innocence and regard for the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense.

*Id.* at 25-26 (citations omitted).

The state relied on circumstantial evidence at trial to prove Beyer's intent in committing the assaults. When a conviction or, as in this case, an enhanced sentence is based on circumstantial evidence, we use a two-step process to evaluate the sufficiency of that evidence. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, we identify the circumstances proved, assuming that the jury resolved any factual disputes in a manner that is consistent with the jury's verdict. *Id.* at 598-99. Second, we independently examine the reasonableness of the inferences the jury could draw from those circumstances. *Id.* at 599. All circumstances proved must be consistent with guilt and inconsistent with any rational hypothesis except that of guilt. *State v. Andersen*, 784 N.W.2d 320, 329 (Minn. 2010).

Applying that standard, the circumstances proved in this case include the following:

- Beyer repeatedly displayed animus toward people who are Black.
- Beyer was aware that the brewery coworker is biracial and made repeated comments to G.R. that focused on the race of the brewery coworker, accusing her, for example, of having "jungle fever" and repeatedly used the term "half-Black" or "f-cking n[-word]" to describe the males G.R. would "cheat" on him with.
- P.R., his adult son, and his other children are Black or biracial.
- Neither Beyer nor G.R. had any connection to P.R., A.R., or their children other than the happenstance that their house was on the same block as the group home where G.R. worked for a period of time.
- Beyer made multiple statements indicating that he believed A.R. was the mother of the brewery coworker.
- P.R.'s adult son did not know G.R.
- Beyer used racial epithets in referring to P.R., A.R., and their family.

This court has previously examined the standard for proving that an offense was committed "because of" another's race or color for purposes of sentencing in an assault case. *See In re Welfare of S.M.J.*, 556 N.W.2d 4, 6-7 (Minn. App. 1996). This court explained:

> Minnesota is not unique in using "because of" in its formulation of bias assault; other courts have interpreted the same words in similar statutes to require the state to prove a causal connection between the infliction of injury and the assailant's perception of the group to which the victim belongs. By requiring a causal link, the statutes exclude offenses committed by a person who entertains racial or other bias but whose bias is not in substantial part what motivated the offense.

*Id.* (citations omitted). The court then analyzed the specific facts of that case, which primarily consisted of the offender's use of a racial slur both for a "period of months" before and during the assault, and determined that there was "sufficient evidence of a causal connection between" the assault and the victim's race. *Id.* at 7.

9

Here, the facts proved support the rational inference that Beyer committed the assaults "because of" the family's race or color. The only reason for Beyer's mistaken belief that P.R.'s adult son was the male with whom G.R. "cheated" is the son's race. When Beyer spoke about G.R.'s infidelity, his language was racially charged. For example, Beyer messaged one of G.R.'s friends stating that she "has cheated on me many times with some n[-word]." The neighbor of Beyer and G.R. testified at trial that she could hear the couple fighting about the infidelity and that she heard Beyer yelling about "f-cking [n-words]." Beyer also used racial epithets in describing the family and frequently made racist comments. And shortly before committing the assaults, Beyer messaged G.R. accusing her of having "jungle fever" and stating: "You have no care for me whatsoever, no love and you never did, all you were was a n[-word] lover."

While we agree that merely making racist comments is not enough to satisfy the state's burden of proof, *id.*, the evidence here ties Beyer's racialized comments directly to this family. Under the standard articulated in *S.M.J.*, the state needed only "to prove a causal connection between the infliction of injury and the assailant's perception of the group to which the victim belongs." *Id.* at 6-7. We conclude that the facts proved here satisfy that standard. We also conclude that the facts proved do not support the alternate hypotheses posited by Beyer.

First, Beyer argues that the facts proved demonstrate that he was just acting out of a jealous rage because he believed that P.R.'s son was the same person as the brewery coworker. He maintains that, because the brewery coworker was biracial, it only makes sense that he would single out a Black or biracial male and not a White male. But this

10

argument ignores the proven fact that the diatribes about G.R.'s infidelity were intertwined with racially derogatory language about being Black or having a relationship with people who are Black. It also ignores the proven fact that Beyer picked out this family only because of their race and the happenstance that they lived on the same block as the group home where G.R. worked.

Second, Beyer argues that the circumstances proved support the rational hypotheses that he committed the assaults in retaliation for his confrontation with P.R. or because A.R. had obtained an HRO that he was arrested for violating. We again disagree. First, the confrontation between Beyer and P.R. happened on May 17 and the assaults did not occur until July 24, over two months later. In addition, Beyer was arrested for violating the HRO nine days before the assaults, but it is clear from the record that his focus in the days leading up to the assaults related to G.R.'s having left for California on July 17—two days after the last incident involving the HRO. Beyer thereafter sent her numerous messages begging her to come back. He sent his last message to G.R. approximately 20 minutes before he left his apartment to steal his friend's car and drive it into the family's house. And in his phone calls to G.R. following his arrest, Beyer repeated his allegations that A.R. was the mother of the brewery coworker and that G.R. knew the family. These circumstances negate Beyer's argument that they support a rational alternate hypothesis that the assaults were motivated by retaliation for the HRO.

Under these facts, there is sufficient evidence to support the jury's determination that Beyer committed the assaults "because of" another's race or color. *See* Minn. Stat. § 609.2233. The evidence demonstrates not just that Beyer exhibited racial bias, but also

11

that there is a causal connection linking Beyer's racial bias and his commission of the assaults. We therefore affirm the district court's imposition of the enhanced sentences of 105 months for the assault offenses.

**Affirmed.**