*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1215**

State of Minnesota, ex rel. Nicole Rae Cloud,
Appellant,

vs.

Paul Schnell, Commissioner of Corrections,
Respondent.

**Filed March 25, 2024**
**Affirmed**
**Larkin, Judge**
Scott County District Court
File No. 70-CV-23-2786

Cathryn Middlebrook, Chief Appellate Public Defender, Gina D. Schulz, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Keith Ellison, Attorney General, Bradley D. Simon, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Considered and decided by Larkin, Presiding Judge; Ross, Judge; and Bjorkman, Judge.

**NONPRECEDENTIAL OPINION**

**LARKIN**, Judge

Appellant challenges the district court's denial of her petition for a writ of habeas corpus following her mandatory removal from Minnesota's Challenge Incarceration Program. We affirm.

**FACTS**

The Challenge Incarceration Program (CIP) is a highly structured early release program that provides individualized programming intended to lower the risk of recidivism for offenders committed to the custody of the Minnesota Commissioner of Corrections. Minn. Stat. §§ 244.17-.172 (2022). The commissioner has discretion to select eligible offenders "to participate in [CIP] . . . for all or part of the offender's sentence if the offender agrees to participate in the program and signs a written contract with the commissioner agreeing to comply with the program's requirements." Minn. Stat. § 244.17, subd. 1(a).

CIP consists of three phases. In Phase I, the offender is confined in a correctional facility for at least six months and must successfully participate in intensive treatment, educational, and work programs. Minn. Stat. § 244.172, subd. 1. In Phase II, the offender is released from prison under a minimum six-month intensive-supervision and surveillance program. *Id.*, subd. 2; *Heilman v. Courtney*, 926 N.W.2d 387, 395 (Minn. 2019) (explaining that phase II participants are not held in a correctional facility and instead, "live in the community"). Phase III has no set duration; it concludes either when the commissioner determines that the offender has completed the program or when the offender's sentence expires, whichever occurs first. Minn. Stat. § 244.172, subd. 3. In the case of the former, the offender must be placed on supervised release for the duration of their sentence. *Id.*

Offenders who violate the conditions of CIP must be met with "severe and meaningful sanctions." Minn. Stat. § 244.171, subd. 4. A violation may result in either a restructuring of the conditions of release or removal from the program entirely. *Id.* Certain

violations require the commissioner to remove an offender from CIP, for example, if the offender "repeatedly fails to follow the rules of the program." *Id.* If removed, an offender must serve the remainder of their term of imprisonment at a correctional facility. *Id.*

The facts here are undisputed. In March 2021, appellant Nicole Rae Cloud was committed to the custody of the commissioner for 56 months following her conviction of first-degree sale of a controlled substance. In approximately April 2021, Cloud was accepted into CIP. By December 2021, Cloud reached Phase II and was released from custody under an agreement that she submit to drug and alcohol testing, report to a designated agent, "comply with all requirements of special supervision [of CIP] as directed by the agent/designee," "reside at and maintain an approved residence," "comply with chemical dependency programming and aftercare as directed by the agent/designee," and "refrain from the use or possession of mood altering substances."

After completing six-months of Phase II, Cloud admitted that she had used methamphetamine. Cloud's supervising agent restructured her program conditions without a formal hearing. Cloud was required to complete a substance-use assessment and to follow its recommendations. The assessment recommended outpatient treatment, which Cloud promptly started. Four months later, Cloud used methamphetamine a second time and was discharged from outpatient treatment based on her provision of positive drug-test results and her failure to attend in-person sessions.

After learning of Cloud's second violation, Cloud's agent filed a program violation notice, alleging that Cloud had violated a restructure condition and failed to abstain from the use or possession of mood-altering substances. Cloud's agent acknowledged that

3

Cloud's last year was a "year of successes and struggles." He reported that upon release from prison, Cloud stayed with her grandmother until her death one month later. He also reported that Cloud obtained employment and eventually was promoted to a supervisor position. At the time of her second program violation, Cloud was working to obtain a driver's license and to regaining custody of her children. In November 2022, Cloud was discharged from outpatient treatment and admitted to her agent that she relapsed after returning to Red Lake for her 17-year-old nephew's funeral. Cloud's out-patient-treatment center "encourage[d] residential treatment."

Cloud's agent did not oppose giving Cloud another chance at treatment, stating that he "would be willing to work with [Cloud] but would understand if she was revoked" from CIP. The agent recommended that Cloud "be allowed to convince [the hearing officer] why she should be restructured and not [removed] and returned to the [correctional] institution."

Cloud's case was scheduled for a hearing with the Department of Corrections Hearings and Release Unit. At that hearing, Cloud admitted that she had used methamphetamine and violated the conditions of CIP. Cloud's agent told the hearing officer that he had communicated with Cloud's treatment center about the possibility of Cloud re-entering treatment. Cloud's attorney reported that Cloud had scheduled a rule 25 assessment while incarcerated and that the jail administrator stated he was not opposed to housing Cloud until she began in-patient treatment. Cloud's attorney emphasized that in-patient treatment would be appropriate for Cloud, since her second relapse occurred when "she [was] exposed to her [drug use] triggers in Red Lake." Cloud's agent agreed that

4

"every time [he] let [Cloud] go to Red Lake she would have issues with [drug] use." Based on the progress Cloud made while released and the circumstances surrounding her program violations, Cloud asked for a restructure.

The hearing officer acknowledged Cloud's success in CIP, stating, "there are so many things [that Cloud] did right." But ultimately, the hearing officer denied Cloud's request for another restructure and revoked Cloud's participation in CIP based on her "repeated failure to follow the rules of the CIP." Cloud was ordered to serve her original term of imprisonment in a correctional facility.

Before the hearing concluded, Cloud argued that she did not "repeatedly" violate CIP rules because that term requires at least three violations. The hearing officer disagreed, stating that the department's position is that "repeatedly" means more than once, and that because Cloud had twice used methamphetamine in violation of program rules, the hearing officer had no discretion to continue Cloud in CIP.

Cloud filed an administrative appeal, arguing that the hearing officer based Cloud's revocation on an erroneous determination that "repeatedly" means "more than once" and violated Cloud's right to due process by failing to consider mitigating circumstances before removing her from CIP. The Department of Corrections rejected both arguments, maintaining that "repeatedly" means "more than once."

Cloud petitioned the district court for a writ of habeas corpus, once again arguing that the hearing officer erred in concluding that "repeatedly" means more than once and that he had no discretion to continue Cloud in CIP. The district court concluded that "repeatedly" means "more than once" and denied Cloud's petition.

5

**DECISION**

Cloud contends that the district court erred by denying her petition for a writ of habeas corpus. A writ of habeas corpus may be used to "obtain relief from [unlawful] imprisonment or restraint." Minn. Stat. § 589.01 (2022). In reviewing an order denying a petition for a writ of habeas corpus, we give great weight to the district court's findings of fact and will uphold the findings if they are reasonably supported by the evidence. *Aziz v. Fabian*, 791 N.W.2d 567, 569 (Minn. App. 2010). Questions of law are reviewed de novo. *State ex rel. Guth v. Fabian*, 716 N.W.2d 23, 26 (Minn. App. 2006), *rev. denied* (Minn. Aug. 15, 2006).

The commissioner generally has discretion when imposing consequences for violations of CIP requirements. *See* Minn. Stat. § 244.171, subd. 4 (providing limited circumstances for mandatory removal of an offender from CIP). But the commissioner lacks discretion and must remove an offender from CIP if the offender does any of the following:

> (1) commits a material violation of or *repeatedly* fails to follow the rules of the program;
>
> (2) commits any misdemeanor, gross misdemeanor, or felony offense; or
>
> (3) presents a risk to the public, based on the offender's behavior, attitude, or abuse of alcohol or controlled substances. The removal of an offender from the challenge incarceration program is governed by the procedures in the commissioner's rules adopted under section 244.05, subdivision 2.

*Id.* (emphasis added).

6

In this case, the hearing officer removed Cloud from CIP under the first clause, reasoning that she had "*repeatedly* fail[ed] to follow the rules of the program." *Id.*, subd. 4(1) (emphasis added). At issue is the meaning of the word "repeatedly." Cloud argues that "the plain meaning of 'repeatedly' requires *at least* three violations." She argues that she did not "repeatedly" violate program rules by using methamphetamine two times and that she therefore was not subject to mandatory removal. The commissioner counters that the plain meaning of "repeatedly" is "more than once" and that because Cloud committed two violations of the program's rules by using methamphetamine, she was properly removed from CIP.

The parties' arguments present a question of statutory interpretation, which we review de novo. *State v. Riggs*, 865 N.W.2d 679, 682 (Minn. 2015). The purpose of statutory interpretation is to "ascertain and effectuate" the legislature's intent. Minn. Stat. § 645.16 (2022). In doing so, we must first determine whether the statute's plain language is ambiguous. *State v. Loveless*, 987 N.W.2d 224, 250 (Minn. 2023). "A statute is ambiguous when its language is subject to more than one reasonable interpretation." *Riggs*, 865 N.W.2d at 682. If a statute is not ambiguous, we apply the statute's plain meaning. *State v. Culver*, 941 N.W.2d 134, 139 (Minn. 2020).

In determining whether a statute is ambiguous, we may look to the canons of interpretation in Minn. Stat. § 645.08 (2022). *State v. Velisek*, 986 N.W.2d 696, 700 (Minn. 2023). When interpreting statutory language, "words and phrases are construed according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1). A statute is "to be read and construed as a whole so as to harmonize and give

7

effect to all its parts." *State v. Friese*, 959 N.W.2d 205, 212 (Minn. 2021) (quotation omitted). When a statute does not define its terms, courts may look to dictionary definitions to determine whether its plain meaning is ambiguous. *Fordyce v. State*, 994 N.W.2d 893, 897 (Minn. 2023). But a term's definition will depend on the context in which it is used. *State v. Alarcon*, 932 N.W.2d 641, 646 (Minn. 2019).

Cloud relies on dictionary definitions to support her position that "repeatedly" plainly means at least three times. For example, *The American Heritage Dictionary of the English Language* defines "repeatedly" as "[s]aid, done, or occurring again and again." 1489 (5th ed. 2018). And it defines "again" as "[o]nce more; anew." *Id.* at 31. Cloud argues that "[b]ecause conduct happening for the first time does not occur 'again,' the first 'again' in the above definitions already contemplates a prior occurrence," meaning that "by the time the conduct has occurred 'again and again,' it has necessarily occurred a minimum of three times."

Although dictionary definitions support Cloud's position, three other sources support the commissioner's position that "repeatedly" means more than once. First, another Minnesota statute defines "repeatedly" to mean more than once. *See* Minn. Stat. § 16C.285, subd. 3(2)(i) (2022) (providing a violation occurs if a contractor "repeatedly fails to pay statutorily required wages or penalties on one or more separate projects" and "that a failure to pay is 'repeated' only if it involves *two or more* separate and distinct occurrences") (emphasis added).

Second, this court has determined that as used in the harassment statute, "'*repeatedly*' means 'more than once.'" *State v. Collins*, 580 N.W.2d 36, 42 (Minn. App.

8

1998) (emphasis added), *rev. denied* (Minn. July 16, 1998). The *Collins* defendant was convicted of two counts of harassment under Minn. Stat. § 609.749, subd. 2(6) (1996), for "'repeatedly us[ing] the mail or deliver[ing] or caus[ing] the delivery of letters, telegrams, packages, or other objects.'" *Id.* at 39-40 (alteration in original). Collins challenged his convictions, arguing in part that "two acts cannot constitute acting 'repeatedly' under the statute." *Id.* at 39. This court disagreed, holding that the term "repeatedly" unambiguously meant "more than once." *Id.* at 42.

The *Collins* court reasoned:

> Most states that have considered the issue have defined "repeatedly" to mean "more than once." Those decisions generally rely on a "plain meaning" analysis. Collins argues that this court should instead follow the analysis of the Supreme Judicial Court of Massachusetts . . . . [which reasoned] that dictionary definitions of the word "repeatedly" differ and concluded that, because it has two possible meanings, the word is ambiguous; the [Massachusetts] court therefore applied the rule that ambiguous criminal statutes are to be strictly construed against the state and concluded that the state needed to prove at least three harassing telephone calls in order to convict a defendant.

> Minnesota also follows the rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity toward the defendant. A statute is ambiguous if it is reasonably susceptible to more than one interpretation. But in this context, we believe that *the reasonableness of an interpretation should be determined by reference to the purpose of the rule of lenity, which is to ensure that criminal statutes will provide fair warning concerning conduct considered illegal.* . . .

> Defining "repeatedly" to mean "more than once" is reasonable under the plain meaning rule and in view of the word's derivation from "repeat." While "repeatedly" also is commonly used to mean "again and again," such a definition

9

provides insufficient guidance for a criminal statute. . . . We therefore hold that for purposes of section 609.749, subdivision 2(6), "repeatedly" means "more than once" and that Collins's conduct can support a conviction under the harassment statute.

*Id.* at 41-42 (emphasis added) (quotations and citations omitted).

Third, the Minnesota Supreme Court has determined that, as used in Minnesota's stalking-by-mail statute, repeatedly means more than once. *In re Welfare of A.J.B.*, 929 N.W.2d 840, 849 (Minn. 2019). Although the *A.J.B.* court stated that "[a]n action is done 'repeatedly' when it is done 'again and again,'" citing *Merriam-Webster's Collegiate Dictionary* 991 (10th ed. 1995), the supreme court also cited *Collins* and said that the term "repeatedly" in the stalking-by-mail statute limited the reach of the statute because "it carves out from criminal sanction those instances when a person delivers a [prohibited] communication . . . *on a single occasion*" and criminalizes "any form of communication that an actor directs *more than once* at a specific person." *Id.* at 849-51 (emphasis added). Thus, the Minnesota Supreme Court has approved *Collins*'s definition of "repeatedly" as meaning "more than once."

Although the *Collins* court defined "repeatedly" within the context of a statute criminalizing harassment, for the three reasons that follow, we are persuaded that the *Collins* definition of "repeatedly" also applies in the context of the CIP statute. First, although *Collins* addressed an element of Minnesota's harassment statute and this case addresses the CIP statute, both statutes address crime: the former regards the elements of a crime, and the latter regards the sentence that may be imposed after conviction of a felony-level crime. *See* Minn. Stat. §§ 244.01-.32 (2022 & Supp. 2023) (governing

criminal sentences and CIP). Thus, it is reasonable to interpret the CIP statute consistent with *Collins* in this instance. *See Collins*, 580 N.W.2d at 42 ("While 'repeatedly' also is commonly used to mean 'again and again,' . . . such a definition provides insufficient guidance for a *criminal* statute." (emphasis added)).

Second, both the harassment statute in *Collins* and the CIP statute impose a consequence for conduct that occurred "repeatedly." In the former, such conduct provides a basis for a harassment conviction and imposition of a prison sentence. In the latter, such conduct provides a basis for removal of a felony-level offender from CIP and return to a correctional facility. Minn. Stat. § 244.171, subd. 4(1). In both instances, the repeatedly occurring conduct results in loss of liberty.

Third, the reasoning of *Collins* is compelling in the context of the CIP statute. Although a violation of CIP may not be "illegal," the potential consequences of a violation are significant and require "fair warning" regarding the number of rule violations that will result in mandatory removal and return to incarceration at a correctional facility. *See Collins*, 580 N.W.2d at 41 ("[T]he reasonableness of an interpretation should be determined by reference to the purpose of the rule of lenity, which is to ensure that criminal statutes will provide fair warning concerning conduct considered illegal." (quotation omitted)). Like the circumstances in *Collins*, defining "repeatedly" to mean "at least three times" is not reasonable here because such a definition does not provide fair warning regarding the exact number of rule violations that will result in mandatory removal from

11

CIP in a particular case. Defining "repeatedly" to mean "more than once" provides a definite answer: two violations will subject an offender to mandatory removal from CIP.[1]

If we were writing on a clean slate, dictionary definitions could yield a different conclusion regarding the meaning of the word "repeatedly" in Minnesota's criminal statutes, including the CIP statute. But this court is bound to follow its own precedent. *State v. M.L.A.*, 785 N.W.2d 763, 767 (Minn. App. 2010) ("The district court, like this court, is bound by supreme court precedent and the published opinions of the court of appeals . . . ."), *rev. denied* (Minn. Sept. 21, 2010). And we discern no persuasive reason not to apply the precedential definition of "repeatedly" from *Collins* here. Doing so is consistent with the Minnesota Supreme Court's reliance on the *Collins* definition of "repeatedly" in *A.J.B.*, as well as the legislature's use of the word to mean more than once in section 16C.285, subdivision 3(2)(i). We therefore apply the reasoning of *Collins* and

---

[1] Cloud also advocates for an interpretation of "repeatedly" that "contemplates not just a particular number of violations but also the frequency of occurrence within a given timeframe and the salience or severity of the violations." Essentially, she argues that a hearing officer must conduct a "fact-intensive analysis" and consider how often and how close in time an offender's violations occur within a given timeframe to determine whether an action occurred "repeatedly." But the CIP statute does not require a hearing officer to consider the "salience" or "severity" of a violation within a given timeframe. Requiring hearing officers to do so would impermissibly add words to a statute, which we cannot do. *See State v. Carufel*, 783 N.W.2d 539, 545 (Minn. 2010) (stating, appellate "court[s] cannot add words to a statute not supplied by the legislature"). Such policy decisions are generally entrusted to the legislature, and not this court. *See LaChapelle v. Mitten*, 607 N.W.2d 151, 159 (Minn. App. 2000) (stating that "[b]ecause this court is limited in its function to correcting errors it cannot create public policy"), *rev. denied* (Minn. May 16, 2000); *Tereault v. Palmer*, 413 N.W.2d 283, 286 (Minn. App. 1987) ("[T]he task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court."), *rev. denied* (Minn. Dec. 18, 1987).

hold, that in the context of Minn. Stat. § 244.171, subd. 4(1), "repeatedly" means "more than once."

Because it is undisputed that Cloud violated the rules of CIP by using methamphetamine more than once, her removal from CIP was mandatory. We therefore affirm the district court's denial of Cloud's petition for a writ of habeas corpus, without addressing Cloud's argument that she was denied procedural due process because the hearing officer erroneously concluded that he was required to remove Cloud from CIP after a second violation.

**Affirmed.**